Andrew **GOTTLIEB** and Jean Gottlieb, individually and as the natural parents of infants Dawn Gottlieb and Lee Gottlieb, Plaintiffs,

v.

The **COUNTY OF ORANGE,** the Orange County Department of Social Services, Esther Coppola in her individual capacity and in her official capacity as an employee of the County of Orange and the Orange County Department of So-

---

cial Services, Linda E. Douthart in her individual capacity and in her official capacity as a supervisory employee of the County of Orange and the Orange County Department of Social Services, Defendants.

No. 93 Civ. 0466 (VLB).

United States District Court,
S.D. New York.

Dec. 15, 1994.

627

Nelson M. Farber, Akst & Akst, New York City, for plaintiffs.

Phyllis Ingram, MacCartney, MacCartney, Kerrigan & MacCartney, Nyack, NY, for defendants.

### MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This civil rights action brought under 42 U.S.C. 1983 implicates the tension between familial privacy and the protection of children from sexual abuse. The dispute arises from a direction to an allegedly abusive father to leave his home where he had a 5–year old girl and a 4–year old son, or face removal of his daughter; the issue is whether the investigation leading to the direction was fair and adequate.

Defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiffs have cross moved for partial summary judgment against all defendants.

Plaintiffs' motion for summary judgment is denied. Defendants' motion for summary judgment is granted as to all claims against the individual defendants in their individual capacities, which are accordingly dismissed.[1]

Defendants' motion is denied as to the County of Orange and the Orange County Department of Social Services.

### II

The basic facts are uncontroverted. On January 24, 1990 a source claiming anonymity telephoned the New York State Department of Social Services and stated that the father "pulls down his pants and underwear and dances around the living room in front of the children." The source asserted that this had occurred more than one time and that the mother was present and laughed.

The report was referred for investigation to the Orange County Child Protective Services. Though a County caseworker attempted to speak to the daughter and attempted to make a home visit, neither attempt was successful.

On January 29, 1990, the source made another complaint alleging that "Father wakes up [his daughter] at night and gets into bed with child. Father touches [her] breasts." In making this second report of abuse, the source no longer chose to remain anonymous but requested confidentiality. The source was recontacted and made further allegations that the father slept with his daughter and hugged her tight.

The questions put to the source focused on the substantive allegations of the source, without background inquiries to evaluate the

1. Due to the highly sensitive issues dealt with in this Order, no names will be used in the text to identify the plaintiffs or individual defendants. See *Christiana v. Metropolitan Life,* 839 F.Supp. 248 (S.D.N.Y.1993).

Plaintiffs' claims against the employees in their official capacities are the equivalent of claims against the governmental entities themselves; since these entities are joined, claims against the individuals in their such capacities need not be

pursued. See *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

Plaintiffs' claims against individual defendants other than those based upon alleged federal constitutional violations do not require discussion. Such claims against the individual defendants are based on essentially the same events and are barred by qualified immunity.

source's reliability, or whether the source may have harbored any malice toward the plaintiffs.

After an interview with the family's son which produced no evidence of abuse, a County caseworker interviewed the daughter for 45 minutes to one hour. A school nurse was present for most of the interview with the daughter, but not for what the caseworker calls the "rapport-building" portion of the interview.[2] The caseworker first asked the daughter questions about her father's pants falling down, to which the daughter giggled.

The daughter then asked the caseworker how she knew of this incident since it was an "in house secret". The caseworker responded that she knew all in house secrets and that it was okay for the daughter to tell her such secrets. The interview then led to such questions as "has anyone touched you here?" while pointing to private parts. The daughter answered "yes." When asked by the caseworker who it was that touched her, the daughter identified her father. In addition, when asked "who knows about this?" the daughter answered "Mommy, grandma, and Aunt Michelle."[3]

The caseworker telephoned her supervisor to discuss the next step. Both agreed that the father or the daughter would have to leave the house. When faced with the choice of his daughter being removed from the house or leaving the house himself, the father chose to leave his home.

## III

Few other events elicit such abhorrence and disgust in our society equal to that evoked by sexual abuse of children. It becomes even more difficult to accept when the perpetrator is a family member. Child pro-

tection services' basic function is to make sure that unprotected children are cared for and that abuse is stopped.

The Fourteenth Amendment of the Constitution of the United States has been held to protect the liberty interest of parents in the "care, custody and management of their child."[4] Such protection patently falls short of allowing a parent sexually to abuse a child. At such a point the constitutional rights of the parents are outweighed by the interests of the child, and of the state in protecting children. *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640 (1981); *Stanley v. Illinois*, 405 U.S. 645, 649, 92 S.Ct. 1208, 1211–12, 31 L.Ed.2d 551 (1971) (A State's right to protect minor children rises to the level of a duty).

If the child's life or health is in "imminent danger" a child protection unit may remove a child from its home without first securing a Court Order. N.Y. Family Court Act § 1024 (McKinney Supp.1994); *Duchesne v. Sugarman*, 566 F.2d 817 (1977). A high level of skill and training is essential to insure that children are protected from abuse and that families are protected from ill-advised interference and disruption, especially on an emergency basis without opportunity for a prior hearing.[5]

Whether a child is in "imminent danger" is necessarily a fact-intensive determination. It is not required that the child be injured in the presence of a caseworker nor is it necessary for the alleged abuser to be present at the time the child is taken from the home. It is sufficient if the officials have persuasive evidence of serious ongoing abuse and, based upon the best investigation reasonably possi-

**2.** See *Gottlieb v. County of Orange*, 151 F.R.D. 258 (S.D.N.Y.1993).

**3.** Based upon concerns of confidentiality, no attempt was made to contact the grandmother or the aunt, although learning of the father's departure under threat of removal of his daughter would doubtless be at least as distressful to these relatives.

**4.** *Van Emrik v. Chemung County Dept of Social Serv.*, 911 F.2d 863, 867 (2nd Cir.1990) *quoting Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct.

1388, 1394, 71 L.Ed.2d 599 (1982); see also *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1971); *Davis v. Page*, 618 F.2d 374, 379 (5th Cir.1980); *Bohn v. County of Dakota*, 772 F.2d 1433, 1435 (8th Cir.1985) *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986).

**5.** Such care is important even in regard to non-governmental, non-emergency action which can have lasting consequences. See *A. & B. v. C. College*, 863 F.Supp. 156 (S.D.N.Y.1994).

ble under the circumstances, have reason to fear imminent recurrence. *Robison v. Via,* 821 F.2d 913, 922 (2d Cir.1987). Since this evidence is the basis for removal of a child, it should be as reliable and thoroughly examined as possible to avoid unnecessary harm to the family unit.

### IV

■ Under the N.Y. Family Court Act § 1024(c), immunity from civil and criminal liability is granted to all persons or institutions "acting in good faith in the removal or keeping of a child." Under 42 U.S.C. § 1983, good faith on the part of a social worker or other state officer constitutes a valid defense of qualified immunity unless the individual defendant involved "knew or reasonably should have known that the action [taken] within [the officer's] sphere of official responsibility would violate . . . constitutional rights . . ." *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982) *quoting Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975).

Under this test, if available information shows an emergency situation such that leaving the children in the custody of the parents presents an imminent danger of harm, the authorities may, and at times must, act to remove the children without parental consent or ultimately necessary procedural safeguards.[6] On the other hand, reliable indications of an emergency must exist. *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977); *Franz v. United States,* 707 F.2d 582 (D.C.Cir.1983); see *Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640 (1980) ("Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision" with respect to the termination of parental status). Hasty and poorly made decisions to remove children from their homes violate the constitutional rights of both parents and children.

The primary function of child protection services is to protect children. This entails not only the need to protect children from abuse but also the need to protect children's constitutional right to the guidance and supervision of a parent. *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977). Decisions to remove children from a home without conducting the best investigation reasonably possible violate the parents' and child's federal constitutional rights.

In determining that the individual defendants are entitled to qualified immunity, the test is whether it was objectively reasonable for them to believe that their acts did not violate the parents' constitutional rights. *Robison v. Via,* 821 F.2d 913, 921 (2nd Cir. 1987).

■ In this case the record establishes an objectively reasonable basis for the caseworker and her supervisor, unless trained in a more sophisticated, less suggestive means of interviewing, to believe there existed an "imminent danger" to the daughter.

Given the procedures and training they were given, it was objectively reasonable for the individual defendants to believe that their acts were necessary to avoid a serious risk of imminent harm to the child and hence did not violate the plaintiffs' constitutional rights. Plaintiffs' claims against the individual defendants are unsupportable.[7]

To hold individual defendants liable where they acted in reasonable good faith would greatly inhibit the decisionmaking processes of child welfare workers. *In re Scott County Master Docket,* 672 F.Supp. 1152, 1167 n. 2 (D.Minn.1987); See also *Archer v. Globe Motorists,* 833 F.Supp. 211, 213–14 (1993). Individual caseworkers and supervisors facing the possibility of losing their life savings in a law suit might allow fear to influence their decisions, intentionally or otherwise. If indi-

---

6. Where the removal takes place without safeguards of notice and an opportunity to be heard because of a genuine emergency, the need for these safeguards is not eliminated but their implementation merely postponed. See *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

7. The claims against these defendants in their official capacity is the equivalent of claims against the governmental entity itself. See *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

vidual caseworkers are less likely to function effectively due to fears of liability, the institution they work for and, more importantly, the goal of that institution, suffer.

### V

The institutional defendants have no defense of qualified immunity, but on the other hand are not liable for unforeseeable individual error by non-policymakers. Under *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), local government units may be sued for damages, as well as for declaratory and injunctive relief whenever "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 691, 98 S.Ct. at 2036. Governmental entities may also be liable for damages whenever the alleged unconstitutional action is a result of failure to train or supervise its employees properly. *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).[8]

As a predicate to liability under *Monell*, there must be a finding of a constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Apodaca v. Rio Arriba County Sheriff's Dept.*, 905 F.2d 1445 (10th Cir.1990).[9]

The central issue in determining whether plaintiffs' constitutional rights have been violated is whether or not there is "imminent danger of harm." Plaintiffs argue that defendants' procedures were inadequate to determine whether there was an imminent danger of harm.

In determining whether imminent harm existed the County personnel took two steps: speaking with the source of the com-

plaint and to the child. Though a confirmation from the victim itself is at times enough to establish imminent harm, such a confirmation may be unreliable if the methods of interviewing are unduly suggestive. In addition to the limited information obtained, another factor casts doubt on the existence of imminent danger: the caseworker's failure effectively to cross-examine the source to test the reliability and objectivity of the report. The County authorities failed to ask the complainant about the circumstances under which the child made the asserted statement implicating her father. They likewise failed to inquire into any possible malice the source may have harbored toward the parents.

The caseworker asked neither the daughter's teacher nor the school nurse, if the child exhibited any behavioral oddities, either before or after the interview with the child. Perhaps most critical, the caseworker's interview with the daughter did not proceed in a neutral non-directive manner before focusing on the critical issues. Instead, the caseworker focused on obtaining confirmation of the complainant's charges against the father. Interviewing of this type is particularly hazardous in questioning children who may wish to please a powerful adult by giving answers thought to be desired or expected, without awareness of the consequences of giving such answers if erroneous.

It is important to avoid constitutional violations that those charged with making the critical decisions concerning emergency removal of family members from a home, receive guidance and instruction concerning, among other matters:

1) methods of evaluating the reliability and motives of complainants;

---

**8.** In order for a governmental entity to be liable for a failure to provide adequate training, it must be shown that: 1) a policymaker "knows to a moral certainty" that employees will be placed in a given situation; 2) the situation puts the employee in a position to make a choice which would be made easier by better training or supervision; and 3) the wrong choice by the employee will often "cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 298 (2nd Cir.1992). All these elements exist in this case.

**9.** Defendants assert that they are not liable for the denial of the constitutional right to familial privacy because the father left the home voluntarily. Such an assertion is without merit. Though the father left his home without being physically forced to do so, the departure was the result of his being informed that his child would be removed if he did not leave.

2) ways of determining with whom to speak after the source, including when to go directly to a child, and when to speak with school staff first;

3) how to interview children in a non-suggestive non-leading fashion, utilizing open-ended, nondirective questions first, so that the information comes from the child without direct or subliminal guidance on the part of the interviewer slowly and gently overlapping before directly discussing the abuse alleged; [10]

4) techniques for adequate supervisory review of reliability of information triggering drastic intervention such as removing a child from home.[11]

No indication of significant substantive training relating to the kinds of questioning appropriate has been forthcoming.[12] Under these circumstances an adverse inference may be drawn.[13]

Such an inference is particularly appropriate against a party seeking summary judgment, but can be overcome by further submissions if the motion is renewed.

### VI

The parties are directed to inform the court within fifteen (15) working days of the date of this memorandum order whether or not they wish court's assistance in regard to settlement. Absent scheduling a settlement conference within that time, the pretrial materials set forth in my individual rules shall be provided within thirty (30) days of the date of this memorandum order.

**SO ORDERED.**

---

10. See A. Carin & B. Sund, *Developing Questioning Techniques* (1971) (for teachers); Asbill, *The Ten Commandments of Cross–Examination Revisited*, 8 Crim.LJ # 4 at 2 (ABA Winter 1994).

11. The utmost impartiality is critical to such decisions. See authorities cited, *Heldman v. Sobol*, 846 F.Supp. 285 (S.D.N.Y.1994); *Suss v. ASPCA*, 823 F.Supp. 181 (S.D.N.Y.1993).

12. Defendants have submitted a list of training courses which the defendants have taken, but have not offered any evidence as to the content taught in such courses.

13. See *Baxter v. Palmigiano*, 425 U.S. 308, 316–20, 96 S.Ct. 1551, 1557–59, 47 L.Ed.2d 810 (1976); *Interstate Circuit v. United States*, 306 U.S. 208, 225–26, 59 S.Ct. 467, 473–74, 83 L.Ed. 610 (1939); *Gray v. Great American Recreation Ass'n*, 970 F.2d 1081, 1082 (2nd Cir.1992); *Brink's, Inc v. New York*, 717 F.2d 700 (2nd Cir.1983).