84 F.3d 511
 Andrew GOTTLIEB, and Jean Gottlieb, individually and as the
natural parents of infants Dawn Gottlieb and Lee
Gottlieb, Plaintiffs-Appellants,
v.
The COUNTY OF ORANGE, Orange County Department of Social
Services, Esther Coppola, in her individual capacity and in
her official capacity as an employee of the County of Orange
and the Orange County Department of Social Services and
Linda E. Douthert, in her individual capacity and in her
official capacity as a supervisory employee of the County of
Orange and the Orange County Department of Social Services,
Defendants-Appellees,
Todd Zeltman, New York State Trooper, in his individual
capacity, Defendant.
 No. 852, Docket 95-7535.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 2, 1996.
Decided May 29, 1996.
 
 Nelson M. Farber, New York City (Akst & Akst, New York City, on the brief), for Plaintiffs-Appellants.
 Phyllis A. Ingram, Nyack, New York (MacCartney, MacCartney, Kerrigan & MacCartney, Nyack, New York, on the brief), for Defendants-Appellees.
 Lansner & Kubitschek, New York City (Carolyn A. Kubitschek, New York City, of counsel), filed a brief for amicus curiae National Coalition for Child Protection Reform in support of Appellants.
 Before: OAKES, KEARSE, and WINTER, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Andrew and Jean Gottlieb (the "Gottliebs") appeal from so much of a final judgment of the United States District Court for the Southern District of New York as dismissed their claims under 42 U.S.C. § 1983 (1994) for compensatory and punitive damages against defendants County of Orange and Orange County Department of Social Services (collectively the "County") and two County employees, Esther Coppola and Linda E. Douthert, for actions taken allegedly in violation of plaintiffs' due process rights during a County investigation into allegations that Andrew had sexually abused plaintiffs' two children. The district court, Vincent L. Broderick, Judge, granted partial summary judgment dismissing plaintiffs' claims against Coppola and Douthert on the ground of qualified immunity. See Gottlieb v. County of Orange, 871 F.Supp. 625 (1994) ("Gottlieb I "). Thereafter, the court, Charles L. Brieant, Judge, granted summary judgment in favor of the County on the ground, inter alia, that the undisputed facts established that the County had adequately trained its caseworkers. See Gottlieb v. County of Orange, 882 F.Supp. 71 (1995) ("Gottlieb II "). On appeal, plaintiffs challenge both summary judgment decisions, contending that they were entitled to summary judgment in their favor or that there were factual issues that precluded summary judgment against them. For the reasons that follow, we disagree and we affirm the judgment of the district court.
 
 I. BACKGROUND
 
 2
 In 1990, the Gottliebs lived in Orange County, New York, with their daughter Dawn, age five, and their son Lee, age four. The County, through its Child Protective Services agency, investigates reports of child abuse in Orange County. On January 24, 1990, the County received from a state agency a report of an anonymous complaint of child abuse in the Gottlieb family.
 
 A. The Abuse Investigation
 
 3
 As recorded by the state agency, the January 24 complaint about the Gottliebs stated that "Father pulls down his pants and underwear and dances around the living room in front of the children. This has occurred more than once. Mother is present when this occurs and laughs about it." On January 29, the County received another complaint; the complainant no longer sought anonymity and said she was the source of the January 24 complaint. The County's record of the complaint stated that according to the complainant ("Source"),
 
 
 4
 [y]esterday, Father pulled down his pants and underwear and danced around the living room. This has happened in the past. Mother is aware of this and she thinks that it's funny. Father wakes Dawn up at night and gets into bed with child. Father tickles Dawn's breasts.
 
 An attached comment sheet also noted:
 
 5
 Dawn stated "Father tickles my boobies". Dawn also said that Father wakes her up and tells her that he has to get in bed with her because she can't sleep. Father then makes her hold him tight. Father tells child not to tell Mommy. Source is extremely concerned about confidentiality. Source watches Dawn after school at 3 p.m. and she picks Lee up at noon from nursery school. Source made first report, but was anonymous. Source wants contact this time.
 
 
 6
 Coppola, a senior caseworker for the County, was assigned to investigate the matter and was given the above information.
 
 
 7
 On January 30, Coppola contacted the Source, who repeated the substance of the above communications. In questioning the Source, Coppola focused on the substance of the allegations and did not conduct "background inquiries to evaluate the source's reliability, or whether the source may have harbored any malice toward the plaintiffs." Gottlieb I, 871 F.Supp. at 627-28. In her deposition, Coppola stated that though she did not specifically ask whether the Source had any malice towards the Gottliebs, she saw no evidence of malice in the Source's responses to the questions that were asked.
 
 
 8
 On January 31, Coppola went to Lee's nursery school, but Lee was absent; Coppola spoke to the principal, though not to Lee's teacher. The principal said that Lee had had no behavioral problems.
 
 1. The Interviews and Events of February 1
 
 9
 On the following day, February 1, Coppola interviewed, seriatim, Lee, Dawn, their mother, and their father. Lee, interviewed at his nursery school, "did not disclose any abuse"; he laughed when asked about his father's pants falling down.
 
 
 10
 Coppola then talked with Dawn at her school in an interview lasting 45 minutes to an hour; Coppola took extensive notes of the interview and was deposed on the subject for several days. The school nurse was present for all but the first 10 minutes of the interview. At the outset, Coppola sought to build rapport with Dawn, stating that Coppola's job was "to protect children." Coppola also asked questions designed to measure Dawn's ability to distinguish fact from fantasy. She determined that Dawn could count on her fingers; knew some colors, her age, and the names of family members; could remember and describe gifts, toys, and her birthday; knew that Coppola could not walk up a wall or fly, and that only birds and planes fly; and was familiar with "non-threatening body parts" such as Coppola's nose and eyes. Dawn played with toys brought by Coppola and said she wanted to draw. Dawn drew pictures that she then covered with black.
 
 
 11
 Before the nurse joined them, Coppola asked Dawn "when [Dawn] was going to tell about Daddy losing his pants." Coppola testified at her deposition that Dawn, who "thought it was pretty funny,"
 
 
 12
 looked at me and she said ... "How do you know that?" And she said, "It's an in-house secret, and daddy doesn't like tattletales." And I said, "It's okay. You can tell me." And then she said how daddy lost his pants and everybody was laughing....
 
 
 13
 Coppola told Dawn that it was all right to tell because Coppola knew "all in house secrets." In the presence of the school nurse, Coppola asked whether Dawn knew other body parts, and Dawn identified breasts, buttocks, and the vaginal area in colloquial terms (e.g., "boobies" for breasts). Coppola then asked, "Remember we just talked about in house secrets and you told me about Daddy['s] pants falling down[?]"; Dawn responded that she did. Coppola reiterated that it was all right for Dawn to talk about in house secrets because Coppola knew about them, but that Dawn had to tell the truth: "it[']s OK to tell but it has to be true[.] It has to really happen." Coppola repeatedly reassured Dawn that what had happened was not her fault and told Dawn it was all right to tell what had happened, so long as she was telling the truth.
 
 
 14
 Coppola asked, "Did Daddy[']s pants fall down?", and Dawn "giggled yes." Then Coppola, indicating her own private areas, asked, "Has any one touched you here[,] here[,] or here[?]"; Dawn said "[Y]es." Thereafter, in response to a series of largely nonleading questions (e.g., "Who touches[?]"; "What does he touch[?]"; "With what[?]"; "Where[?]"; "Who knows about this[?]"; and "How do you know they know this[?]"), Dawn proceeded to state that on three occasions in the dark in her room, her father had inserted and moved his finger inside her vaginal area. Dawn said her father also touched her brother's anus. Dawn said her mother, aunt, and grandmother knew that her father touched her, that her mother and grandmother had told her father to stop, and that her parents had fought about it. Her father had stopped for a while but then had resumed. Dawn said she had never touched her father's private parts but that her brother had touched her private parts after seeing her father touch them. Dawn indicated that she was afraid to have anyone outside of the family learn of these events and feared that she would be punished if she talked about them outside of the home.
 
 
 15
 After the interview, Coppola asked the nurse whether Dawn had had any behavior problems; the nurse subsequently informed Coppola that there had been no behavior or attendance problems. Coppola also talked with Dawn's teacher and, speaking only in generalities, asked her to "support" Dawn and to inform Coppola if any problems arose.
 
 
 16
 Coppola immediately reported to Douthert, her supervisor, the substance of Dawn's statements, and Douthert told Coppola to contact law enforcement. Coppola and a state trooper, defendant Todd Zeltman, proceeded to interview Dawn at Dawn's baby sitter's home. According to Zeltman's deposition, Dawn made statements confirming Coppola's account of the initial interview.
 
 
 17
 Coppola then interviewed Dawn's mother, Jean, who denied that Dawn had told her of any sexual abuse. Jean stated that Dawn could have gotten the idea of her father inserting and moving his finger in her vagina by watching a pornographic video that Jean claimed Dawn had viewed accidentally the prior weekend. Coppola then spoke with Dawn's father, Andrew. Andrew said that his pants had once fallen down accidentally (an explanation Coppola testified she had found "valid"), and he denied sexually abusing Dawn.
 
 
 18
 After these interviews, Coppola informed the Gottliebs that the County would seek to take Dawn and Lee into custody pending completion of the investigation unless Jean could make suitable arrangements to separate the children from Andrew. Jean was offered the alternative of making suitable arrangements for herself and the children to stay elsewhere; she was told that it would not be suitable for them to stay with Andrew's mother or sister, who Dawn had said knew of the abuse. The Gottliebs were also offered the alternative of having Andrew move out of the home for 90 days. The Gottliebs spoke with an attorney by telephone. Then, rather than have the children moved or removed, Andrew left the home.
 
 2. The Subsequent Events
 
 19
 Although on February 1 Andrew had volunteered to take a lie detector test regarding Dawn's allegations, he withdrew that offer on the advice of counsel. The Gottliebs and the County then agreed on a cooperative course of action. Jean took Dawn to see a physician and a psychiatrist of the Gottliebs' own choosing "[f]or validation purposes"; after examinations, these doctors opined that there was no evidence of sexual abuse. Approximately one month after he left the home, Andrew was allowed to return and remain in the home.
 
 
 20
 Nonetheless, in April 1990, a state-agency follow-up report marked the matter "indicated" rather than "unfounded," and a review body found that "there was 'some credible evidence' of sexual abuse and inadequate guardianship of both children by their parents." No judicial proceeding was instituted, however, until October 1990, when the County applied in family court for an order directing that experts chosen by the County be permitted to examine Dawn to assess the allegations of sexual abuse. That application was withdrawn in November 1990, apparently based on an agreement between plaintiffs and the County to have County experts examine the reports of plaintiffs' doctors who had examined Dawn in February 1990. After completing their review of those reports in January and February of 1991, the County's experts expressed a desire to conduct independent examinations. The County did not make a new family-court application for examinations until June. That court denied the application on the ground that the existing expert opinions that no abuse had occurred, combined with the County's delays in seeking an order permitting its own experts' examination, persuaded the court that it was not in the best interests of the child to undergo any further examinations in connection with events alleged to have occurred some 17 months prior to the County's June 1991 application.
 
 
 21
 Eventually, after a state administrative proceeding, the complaints against the Gottliebs were expunged from the record.
 
 B. The Present Action
 
 22
 Plaintiffs commenced the present action in January 1993 pursuant to 42 U.S.C. § 1983, alleging, inter alia, that the investigation and the removal of Andrew from the Gottliebs' home violated their rights to procedural and substantive due process. To the extent pertinent to this appeal, the complaint alleged (1) that plaintiffs were denied procedural due process because they were not afforded a hearing before or after Andrew was forced to leave the home; and (2) that plaintiffs were denied substantive due process because (a) Coppola interviewed Dawn without plaintiffs' knowledge and consent, (b) there was not a sufficient basis for the County to separate Andrew from his children, and (c) the County's hiring and training of its caseworkers evinced deliberate indifference towards the privacy interests of families. Following a period of discovery, Zeltman was dismissed from the case by stipulation, defendants moved for summary judgment dismissing the complaint, and plaintiffs cross-moved for partial summary judgment in their favor.
 
 
 23
 In Gottlieb I, Judge Broderick denied plaintiffs' motion without comment. He granted defendants' motion insofar as it sought dismissal of the claims against Coppola and Douthert on the ground of qualified immunity, stating that the record provided "an objectively reasonable basis" for them "to believe there existed an 'imminent danger' to the daughter." 871 F.Supp. at 629. As for the claims against the institutional defendants, the court noted that though the County argued that its training of its caseworkers did not display a deliberate indifference to constitutional rights, the County had merely "submitted a list of training courses which the defendants have taken, but ha[d] not offered any evidence as to the content taught in such courses," id. at 631 n. 12. The court therefore denied the County's motion, ruling that the County had not proffered evidence of "significant substantive training relating to the kinds of questioning appropriate." Id. at 631. The court stated that such evidence could be submitted in support of a renewed summary judgment motion by the County.
 
 
 24
 The County thereafter renewed its motion, supplementing its presentation of evidence as to its hiring and training practices for caseworkers assigned to investigate allegations of child abuse. To qualify for a position in the sexual abuse unit of the County's child protective services agency, an applicant was required to possess a four-year higher education degree and one year of casework experience. Coppola, who joined the unit in 1987 or 1988, had bachelor's and master's degrees in social work and took two written tests to qualify for her position as senior caseworker. Coppola received ongoing training, and by January 1990 she had completed some 46 hours of training courses whose titles indicated a focus on sexual abuse investigation and interviewing or on child sexual abuse victims. Douthert held a master's degree in social work and, by January 1990, had completed about 39 hours of County-sponsored training with respect to the investigation of child abuse, in particular sexual abuse, and with respect to sexual-abuse interviewing skills.
 
 
 25
 The record as to the content of the County's child protective services ("CPS") training courses included the following. County caseworkers were taught to follow the procedures set out in the New York State Child Protective Services Program Manual ("CPS Manual"). The CPS Manual states, inter alia, that it is important to contact the source of an abuse report "to clarify information contained in the report" and "to obtain additional information." It also states:
 
 
 26
 The CPS worker should be patient and flexible. Rapport can be established with the child by asking him/her some general questions about him/herself and by explaining the purpose of the interview in a manner appropriate to the child's ability to understand. During the course of the interview, the CPS caseworker should ask questions in a non-judgmental and supportive way to elicit information concerning the allegations. The children need to be reassured that they are not bad, in trouble, or at fault....
 
 
 27
 Coppola's training also included programs that used a New York State Child Protective Services guidebook called "The Sexual Abuse Interview" ("CPS Interview Guidebook") and the New York State Child Protective Services Training Institute Guidebook ("CPS Training Guidebook"). The CPS Interview Guidebook notes that "[a] person must be able to communicate with a child and be able to elicit an account of what actually occurred without leading the child victim or introducing suggestive material prematurely." It undertakes to ensure that at the conclusion of training, "participants will be able to ... recognize how leading questions can contaminate the objectivity of the investigative interview." The CPS Interview Guidebook contains an exercise consisting of a column of "Leading Questions" that participants are required to transpose into "Non-leading Questions." An "Interview Checklist" instructs caseworkers to ask themselves, "Were open ended questions asked effectively?" and "Were the questions leading/suggestive?" In addition, Volume One of the CPS Training Guidebook warns caseworkers to, inter alia, "Solicit information in a non-accusatory manner [and] ask open-ended questions." It admonishes "DON'T ... Lead the interview by asking yes/no questions," and "DON'T ... Tell the child what happened concerning the allegations, e.g., 'Daddy really beat you last night, didn't he?'."
 
 
 28
 In Gottlieb II, Judge Brieant granted the County's renewed and augmented summary judgment motion and dismissed the claims against the County. As to the substantive due process claim, the court reviewed the County's evidence of its training on child sexual abuse investigation, and found that plaintiffs had "offered nothing to indicate that the training was perfunctory or that the instructions were ignored in the County's training programs" and had "failed to provide any evidence which would establish the inadequacy of training." 882 F.Supp. at 73. As for the procedural due process claim, the court held that there had been no violation because, inter alia, it was reasonable for Coppola, who had received adequate training, to believe that the immediate separation of Andrew from Dawn was required because of emergency circumstances. The court noted that Andrew had thereafter secured the examiners of his choice, cooperated with the investigators, been allowed to return home, and ultimately had the complaints expunged from the record. See id.
 
 
 29
 There being no remaining unresolved claims, a final judgment was entered dismissing the complaint. This appeal followed.
 
 II. DISCUSSION
 
 30
 On appeal, plaintiffs principally pursue their claims (1) that they were deprived of substantive due process because the primary factual predicate for the County's separation of Andrew from his children was statements by Dawn that had been elicited by leading questions from an improperly and carelessly trained caseworker, and (2) that they were deprived of procedural due process because the County failed to seek judicial ratification of its insistence that Andrew and the children be separated. For the reasons that follow, we are unpersuaded.A. The Substantive Due Process Claims
 
 
 31
 It is established that parents have a fundamental, constitutionally protected liberty interest in the custody of their children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 651-52, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551 (1972); Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir.1977). Where, however, there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parents' custody at least pending investigation. See, e.g., Cecere v. City of New York, 967 F.2d 826, 829 (2d Cir.1992); Robison v. Via, 821 F.2d 913, 921-22 (2d Cir.1987); Duchesne v. Sugarman, 566 F.2d at 826. Plaintiffs claim that there was no such basis in the present case and that all of the defendants are liable for separating Andrew from the rest of the family. We conclude that the district court properly dismissed these claims.
 
 
 32
 In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy. See, e.g., City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989); Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 2436-37, 85 L.Ed.2d 791 (1985) (plurality opinion); Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). The inference that such a policy existed may arise from "circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." Ricciuti v. New York City Transit Authority, 941 F.2d 119, 123 (2d Cir.1991); see, e.g., City of Canton v. Harris, 489 U.S. at 390-91, 109 S.Ct. at 1205-06; Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir.1992), cert. denied, 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993); Sorlucco v. New York City Police Department, 971 F.2d 864, 870-71 (2d Cir.1992).
 
 
 33
 A government employee sued in her individual capacity for damages arising out of her performance of discretionary functions is entitled to qualified immunity where it was objectively reasonable to believe that her acts did not violate clearly established federally protected rights. See, e.g., Anderson v. Creighton, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987); Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); Robison v. Via, 821 F.2d at 920. The qualified immunity defense may be upheld as a matter of law when the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that she was acting in a fashion that did not violate such a right. See, e.g., Robison v. Via, 821 F.2d at 921; Halperin v. Kissinger, 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, J., sitting by designation).
 
 
 34
 In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by Fed.R.Civ.P. 56(e), the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried. He cannot defeat the motion by relying on the allegations in his pleading, see id., or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible, see, e.g., L & L Started Pullets, Inc. v. Gourdine, 762 F.2d 1, 3-4 (2d Cir.1985); Wyler v. United States, 725 F.2d 156, 160 (2d Cir.1983). The motion "will not be defeated merely ... on the basis of conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).
 
 
 35
 In ruling on a motion for summary judgment, the district court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought, see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 57 (2d Cir.1987). If the undisputed facts reveal that there is an absence of sufficient proof as to any essential element on which the opponent of summary judgment has the burden of proof, any factual dispute with respect to other elements becomes immaterial and cannot defeat the motion. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir.1992), cert. denied, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993). We will reverse the granting of summary judgment if there is any evidence in the record from which a reasonable inference on an issue of material fact could be drawn in favor of the nonmoving party. See, e.g., Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir.1995); Bryant v. Maffucci, 923 F.2d at 982.
 
 
 36
 In the present case, there seems to be no genuine dispute as to what Dawn told Coppola. Coppola testified to the statements summarized in Part I.A.1. above; her account was confirmed by her notes of the interview. Zeltman testified in his deposition that Dawn's statements in the subsequent interview that he attended were consistent with Coppola's account of the first interview; Zeltman's testimony was confirmed by his own official report. Although in response to defendants' summary judgment motion plaintiffs denied that Dawn made certain statements, their denials were conclusory, and they did not present any evidence that would undermine the evidence presented by defendants. Indeed, Jean Gottlieb's own deposition testimony conflicts with plaintiffs' denial. Jean testified that after Andrew's return to the home, Dawn said, " 'I didn't tell the truth and I know that nothing happened.' " Thus, though Jean's testimony sought to impeach the content of Dawn's statements, it supported defendants' evidence that the statements were in fact made. Dawn's statements plainly provided an objectively reasonable basis for Coppola and Douthert to believe that Andrew and Dawn should be separated, at least pending further investigation.
 
 
 37
 Although plaintiffs argue that there were issues of fact that should have precluded summary judgment dismissing their substantive due process claims, much of their argument is conclusory or ignores the record. For example, plaintiffs argue that the statements Dawn made were suspect because the questions Coppola asked were leading. But the County presented evidence of the questions asked by Coppola, and plaintiffs did not controvert that evidence. As detailed above in Part I.A.1., the questions that elicited Dawn's damaging allegations of Andrew's manipulation of her vagina were not leading. Neither plaintiffs' conclusory statements to the contrary nor their emphasis on preliminary questions that were to an extent leading was sufficient to create a genuine issue to be tried as to whether the material portion of Coppola's interrogation was leading.
 
 
 38
 Further, though plaintiffs argue that "CPS caseworkers were not trained ... to avoid asking leading questions" (Plaintiffs' brief on appeal at 41), that conclusory and unsupported assertion could not create a triable issue in light of the contrary documents submitted by the County. For example, as set out in Part I.B. above, the CPS Interview Guidebook used by the County to train caseworkers including Coppola undertook to ensure that at the conclusion of training, "participants will be able to ... recognize how leading questions can contaminate the objectivity of the investigative interview"; it provided exercises requiring the caseworker to transform leading questions into nonleading questions; and it repeatedly stressed that the caseworker must "be able to elicit an account of what actually occurred without leading the child." (Emphases added.) Similarly, the CPS Training Guidebook admonished "DON'T ... Lead the interview by asking yes/no questions," and "DON'T ... Tell the child what happened concerning the allegations, e.g., 'Daddy really beat you last night, didn't he?'."
 
 
 39
 Plaintiffs did not come forward with any evidence to suggest that the documents submitted by the County were not used in training County CPS caseworkers in general or Coppola in particular. Plaintiffs' challenge to the adequacy of the County's training of caseworkers is instead premised on the initial denial of summary judgment in Gottlieb I and their argument that "the fact that two federal judges could examine the same record and disagree as to whether the Constitution was violated strongly suggests that reasonable jurors could do the same." (Plaintiffs' brief on appeal at 39 (emphasis added).) This argument is flawed in that, inter alia, the materials before the judges in Gottlieb I and Gottlieb II were not the same. The Gottlieb I court stated that on the record before it the County had not shown adequate training, but the court invited supplementation of the record. The County thereafter presented new evidence. The Gottlieb II court made its ruling on the basis of the augmented record.
 
 
 40
 In sum, plaintiffs failed to come forward with any evidence to controvert defendants' showing as to (a) the content of the training given Coppola and Douthert, (b) the propriety of that training, (c) the nonleading nature of the questions that elicited Dawn's accusations against Andrew, and (d) the damning nature of the statements made by Dawn. The properly conducted investigation gave reasonable ground for Coppola and Douthert to believe that there existed circumstances warranting the separation of Andrew from Dawn pending further inquiry. The district court properly concluded that there were no genuine issues of material fact to be tried with respect to plaintiffs' substantive due process claims because, even with all permissible inferences drawn in favor of plaintiffs, no rational juror (a) could reasonably find deliberate indifference on the part of the County in light of the training courses described above, or (b) could fail to find that Coppola and Douthert had a reasonable basis for believing that the circumstances warranted the immediate separation of Andrew from Dawn.
 
 B. The Procedural Due Process Claims
 
 41
 Plaintiffs contend that they were denied procedural due process principally because defendants failed to give them notice and a hearing before or after requiring Andrew's separation from Dawn. The district court properly dismissed these claims as well.
 
 
 42
 A parent may not lawfully be deprived of the custody of his or her child without a hearing "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). It is established, however, that government officials may remove a child from his or her parents' custody before a hearing is held where there is an objectively reasonable basis for believing that a threat to the child's health or safety is imminent. See, e.g., Cecere v. City of New York, 967 F.2d at 829; Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir.1991); Robison v. Via, 821 F.2d at 921-22; Duchesne v. Sugarman, 566 F.2d at 826.
 
 
 43
 For the reasons discussed in Part II.A. above, a rational juror could not fail to conclude that defendants had an objectively reasonable basis for believing that the prompt separation of Andrew from Dawn, without pausing to obtain a court order, was necessary. The Source had reported ongoing sexual abuse of Dawn; Dawn herself described repeated molestations by Andrew; and Dawn said that Andrew did not like "tattletales" and that she expected to be punished if she spoke of those matters outside of the home. Accordingly, no pre-separation hearing was required.
 
 
 44
 The question remains whether plaintiffs were deprived of due process because there was no judicial review following Andrew's departure from the home. Where there has been an emergency removal of a child from a parent's custody without a hearing, due process requires that the state procedures provide the parent an opportunity to be heard at a reasonably prompt time after the removal. See generally Armstrong v. Manzo, 380 U.S. at 552, 85 S.Ct. at 1191. We conclude that the available state procedures provided Andrew with such an opportunity.
 
 
 45
 At the time of the events in the present case, the New York Family Court Act ("Act"), N.Y.Fam.Ct.Act §§ 1021-1030 (McKinney 1983 & Supp.1990), authorized a designated employee of a county department of social services, where there was not time to obtain a court order, to take a child into protective custody if the employee "ha[d] reasonable cause to believe that the child [wa]s in such circumstance or condition that his continuing in said place of residence or in the care and custody of the parent or person legally responsible for the child's care present[ed] an imminent danger to the child's life or health," id. § 1024(a). In the case of such a removal on the ground of abuse, the child protective agency was required either to petition the family court for an order that the child not be returned to the home, or to recommend to the court either that the child be returned to the home or that no petition be filed. See id. § 1026. If for any reason the child was not returned to the home, the agency was required to file a petition with the court, and a hearing was required to be held not later than three court days from the date of the child's removal. See id.; see also id. § 1021 (requiring officials to file family-court petition if child not returned within three days after removal with consent).
 
 
 46
 If the child was removed from the home pursuant to § 1024, that section required the agency, coincident with removal, to give written notice to the parent or legal custodian of the right under § 1028 of the Act to apply to the family court for the return of the child. See id. § 1024(b)(iii). Section 1028 provided that, if there was no prior hearing, the parent or legal custodian of a child temporarily removed pursuant to § 1024 could apply for an order returning the child to the applicant's custody. Unless good cause was shown, a hearing was required to be held within three court days of the application. See id. § 1028.
 
 
 47
 Although § 1028 made express provision for the parent to make such an application only where the child had been "removed" from the home, a substantially similar successor section has been interpreted to encompass circumstances in which the child remained in her home but one parent's custodial rights were altered. Thus, in Commissioner of Social Services ex rel. Alexandria H., 159 Misc.2d 345, 346, 348, 604 N.Y.S.2d 471, 471-72, 473 (N.Y. Fam. Ct.1993), where separated parents had joint custody of a child who resided with her mother, § 1028 was interpreted to permit the father to challenge an order releasing the child to the sole custody of the mother. Thus, Andrew had the opportunity to have a judicial hearing within three days of his departure from the home simply by making application to the family court pursuant to § 1028.
 
 
 48
 Notwithstanding Andrew's opportunity to obtain such a hearing, plaintiffs contend that the burden of commencing a judicial proceeding was on the County and that the County's failure to do so constituted a denial of due process. Plaintiffs rely heavily on language in Duchesne v. Sugarman stating that after the emergency removal of the children in that case, the burden of initiating judicial review was on the welfare agency. The facts of Duchesne, however, were entirely different from those here. In Duchesne, the agency had taken custody of two children in emergency circumstances because their mother had been hospitalized and there was no one to care for them. The mother did not consent, however, despite agency requests, to a transfer of custody. After the mother was released from the hospital, she immediately and repeatedly sought the return of her children. Her requests were rejected. After more than a year of such rejections, she eventually sought legal advice and commenced a habeas corpus action; only thereafter did the agency seek judicial authorization to retain custody of the children. The interval between the agency's removal of the children and its application for judicial authorization had been more than two years. Noting that after her release from the hospital the mother had made "numerous and vociferous requests" for the return of her children, that there was "an uneven situation in which the government has a far greater familiarity with the legal procedures available for testing its action," and that the mother was "uneducated and uninformed in legal intricacies," the Duchesne court stated that "[i]n this situation, the state cannot constitutionally 'sit back and wait' for the parent to institute judicial proceedings.... The burden of initiating judicial review must be shouldered by the government." 566 F.2d at 828.
 
 
 49
 The circumstances in Duchesne were a far cry from those here. In the present case, for example, the Gottliebs consulted with an attorney by telephone on February 1 before there was any separation of Andrew from Dawn. Further, after that consultation with the attorney, Andrew elected to leave the home pending completion of the investigation, rather than have the children uprooted to live with relatives or taken into County custody. While we do not suggest that there is no substantive deprivation where the parent elects to leave the home in preference to having the child removed, that election has an impact on what procedures are required of the governmental agency.
 
 
 50
 When the agency takes the child into its own custody, causing a complete uprooting, it must promptly seek court approval. There are sound policy reasons for not imposing such a requirement automatically when, in preference to having the child removed, the parent has temporarily agreed to leave the home. First, such a requirement would remove one incentive for the agency to offer temporary parental departure as an alternative to removal of the child; the preservation of that alternative would seem generally to be in the best interest of the child. Further, from the departing parent's standpoint, judicial review may not be the preferred method of resolving the matter, for the statutory procedures envision a hearing within three days, and the evidence or allegations may be such that the parent believes the matter likely cannot be adjudicated quickly. He may well consider it in his or his family's best interest to have the investigation proceed on a cooperative basis rather than by adjudication. The imposition of an automatic requirement that the agency seek a court order even after a parental departure would deprive the parent of the option to proceed on a nonadjudicative basis.
 
 
 51
 The events in this case are illustrative. The Gottliebs promptly retained an attorney, began negotiations with the County, and entered into a cooperative effort to resolve the matter. As a result, the Gottliebs were allowed to have the investigation proceed with Dawn being examined only by doctors of their own choosing--an unlikely result had there been a court proceeding--and Andrew was allowed to return home after one month rather than the three months originally envisioned for the investigation.
 
 
 52
 Further, if a departing parent wishes to have the agency initiate judicial review, he can cause it to do so simply by writing to the agency and informing it that he intends to return to the home five days later unless the agency obtains a court order forbidding his return. Had Andrew given the County such notice, it would then have been incumbent on the County to secure an order enforcing his separation from Dawn. In the absence of such notice by Andrew, however, the parties were free to resolve the matter without judicial intervention.
 
 
 53
 We conclude that due process was satisfied because Andrew had the opportunity to obtain prompt post-separation judicial review either by filing an application pursuant to § 1028 or by notifying the County of his intention to return home, which would have forced the County to seek a court order. Either would have resulted in the hearing that plaintiffs claim they were denied.
 
 CONCLUSION
 
 54
 We have considered all of plaintiffs' contentions on this appeal and have found them to be without merit. The judgment of the district court is affirmed.