

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-6-1997

# Croft v. Westmoreland Cty

Precedential or Non-Precedential:

Docket 95-3528

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Croft v. Westmoreland Cty" (1997). *1997 Decisions*. Paper 4.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/4

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-3528
_____

HENRY L. CROFT, JR.; CAROL CROFT, INDIVIDUALLY
AND AS PARENTS AND NATURAL GUARDIANS OF CHYNNA CROFT,
A MINOR,

Appellants

v.

WESTMORELAND COUNTY CHILDREN AND YOUTH SERVICES;
WESTMORELAND COUNTY; CARLA DANOVSKY,

Appellees
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. No. 93-00995)
_____

Argued June 28, 1996
_____

Before: BECKER, NYGAARD AND LEWIS, Circuit Judges
_____

(Opinion Filed: January 6, 1997)
_____

Alexander H. Lindsay, Jr.
Lindsay, Lutz, Jackson,
Pawk & McKay
408 North Main Street
Butler, Pa.  16001

Susan S. Jackson (Argued)
Lindsay, Lutz, Jackson,
Pawk & McKay
408 North Main Street
Butler, Pa.  16001

Counsel for Appellants

Sherry L. Halfhill (Argued)
Burns, White & Hickton
120 Fifth Avenue
Suite 2400

Pittsburgh, Pa. 15222

Counsel for Appellee
Westmoreland County Children
and Youth Services and
Appellee Carla Danovsky


David J. Singley (Argued)
Israel, Wood & Puntil
310 Grant Street
Suite 501
Pittsburgh, Pa. 15219

Counsel for Appellee
County of Westmoreland

_____

OPINION OF THE COURT
_____

NYGAARD, <u>Circuit Judge</u>.


Plaintiffs-Appellants, Dr. Henry L. Croft, Jr., and Carol Croft, individually and as parents and natural guardians of Chynna Croft, appeal an order of the district court granting summary judgment for defendants-appellees, Carla Danovsky, Westmoreland County Children and Youth Services, and Westmoreland County. We will reverse and remand.

I.

On February 1, 1993, Gerald Sopko, Assistant Director of the Westmoreland County Children's Bureau received a call from Childline, informing him that Dr. Croft was sexually abusing his daughter, Chynna. Sopko was further told that the child slept with her parents and that she had recently been out of the house naked, walked to a neighbor's house, knocked on the door, and told the neighbors that she was "sleeping with mommy and daddy."

2

Barbara Jollie, Program Director for the Assessment Department of the Westmoreland County Children's Bureau, assigned the matter to Carla Danovsky for investigation. Danovsky, accompanied by State Police Trooper Griffin, went to the Croft home that night. Danovsky told Dr. Croft she was investigating him for possible sexual abuse of his daughter based on the Childline report. Dr. Croft consented to be interviewed.

Dr. Croft explained that Chynna had indeed, in April of 1992, left her bed without waking her parents, gone downstairs and outside, and locked herself out of the house. She then went to the house of her babysitter/nanny, a short distance from the Croft home, wearing her pajama top and holding her pajama bottoms with a soiled diaper inside. He further provided Danovsky with the telephone number of the nanny who could verify his version of events.

Dr. Croft agreed that his daughter had seen him naked and that, in fact, the family vacationed in the French West Indies where nude beaches are routine. Dr. Croft stated that his wife sunbathed nude around Chynna. He explained that Chynna suffered from seizures and, although she regularly slept in her parents' bed so they could be nearby if necessary, she slept naked only rarely. Henry and Carol Croft slept clothed. Dr. Croft told Danovsky that he had applied medicinal creams to her vaginal area when she had a rash. He denied sexually abusing Chynna.

Danovsky gave Dr. Croft an ultimatum: unless he left

3

his home and separated himself from his daughter until the investigation was complete, she would take Chynna physically from the home that night and place her in foster care. Dr. Croft then left the room and Danovsky interviewed Carol Croft while Chynna sat in her lap. Carol Croft confirmed Dr. Croft's version of the April 1992 incident when Chynna locked herself out of the house. Finally, Danovsky questioned Chynna, who also confirmed Dr. Croft's version of the lock-out incident. Chynna provided no indication that she had ever been sexually abused. Danovsky then reiterated her ultimatum, that unless Dr. Croft immediately left his home and had no contact with his daughter, Danovsky would remove Chynna from the home that very night and place her in foster care. Faced with this dilemma, Dr. Croft complied with her ultimatum, and left his home, wife and daughter.[1]

Danovsky testified to some inconsistencies between the statements of the Croft parents. She testified that Carol Croft said that Chynna never saw Henry Croft swimming naked, and that she sunbathed topless but not totally nude. One of the parents informed Danovsky that Chynna never slept naked in their bed, while the other said she was not clothed all the time. In sum, however, the differences were insignificant and reasonable under the circumstances. Danovsky also testified that, pursuant to

---

[1] Defendants repeatedly have characterized Dr. Croft's decision to leave as "voluntary." This notion we explicitly reject. The threat that unless Dr. Croft left his home, the state would take his four-year-old daughter and place her in foster care was blatantly coercive. The attempt to color his decision in this light is not well taken.

4

County policy, a parent accused of sexual abuse must prove beyond any certainty that there was no sexual abuse before she would be permitted to leave a child with his or her parents. She further testified that if a County caseworker does not know whether or not the allegation is true, the child will be separated from the alleged perpetrator. Danovsky also testified that at the conclusion of her interview with the Crofts, she was uncertain whether any sexual abuse had occurred.

The Crofts filed a complaint in the federal district court against Westmoreland County Children and Youth Services (WCCYS), Carla Danovsky and Westmoreland County. They alleged that the defendants had impermissibly interfered with their Fourteenth Amendment liberty interest in the companionship of their daughter.

Defendants filed motions to dismiss the complaint, which, since discovery had been completed, were considered as motions for summary judgment. They argued that defendant Danovsky was entitled to qualified immunity for her actions and that the county and WCCYS enjoyed municipal immunity from the charges. The court entered summary judgment against the Crofts on all three counts, asserting that the Crofts would impermissibly have the court elevate their right to freedom of intimate association above Defendants' obligation to protect children. The Crofts timely appealed.[2]

---

[2]We note that the Crofts are appealing the district court's order with respect only to the County and the WCCYS, not as to Carla Danovsky. Furthermore, the Crofts are only appealing the district court's determination of their substantive due

II.

We recognize the constitutionally protected liberty interests that parents have in the custody, care and management of their children.  See Lehr v. Robertson, 463 U.S. 248, 258, 103 S.Ct. 2985, 2991-92 (1983); Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir. 1987).  We also recognize that this interest is not absolute.  Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir. 1994); Myers, 810 F.2d at 1462.  Indeed, this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children --- particularly where the children need to be protected from their own parents.  See Myers, 810 F.2d at 1462.  The right to familial integrity, in other words, does not include a right to remain free from child abuse investigations.  Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993).

The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process.[3]  In determining whether the Crofts' constitutionally protected interests were violated, we must balance the fundamental liberty interests of the family unit with the compelling interests of the state in

---

process issues.

[3]We note here only that the policy of removing the suspected parent from the family home during the pendency of child abuse investigations absent any procedural safeguards raises a procedural due process issue.

6

protecting children from abuse. Whatever disruption or disintegration of family life the Croft's may have suffered as a result of the county's child abuse investigation does not, in and of itself, constitute a constitutional deprivation. Watterson, 987 F.2d at 8; see also Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir. 1992).

We realize there may be cases in which a child services bureau may be justified in removing either a child or parent from the home, even where later investigation proves no abuse occurred. However, a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse. See Lehr, 103 S.Ct. at 2990 (declaring liberty interests in preserving the family unit "are sufficiently vital to merit constitutional protection in appropriate cases") (emphasis added); accord Myers, 810 F.2d at 1462-63 (noting parental liberty interest in maintaining integrity of family unit is not a clearly established right where there is a "reasonable suspicion" abuse may have occurred).

Our focus here is whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference with the Crofts' rights as Chynna's parents.[4]

_____

[4] This proposition is most often raised against government action that threatens to remove a child from his or her home. Nonetheless, we can discern no rational distinction which would entitle governments to order parents from their homes

7

Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power. See Gottlieb v. County of Orange, 84 F.3d 511, 517 (2d Cir. 1996) (finding no due process violation for removing child where child welfare workers possess objectively reasonable basis for believing parental custody represents a threat to child's health or safety); Thomason v. SCAN Volunteer Services, Inc., 85 F.3d 1365, 1371 (8th Cir. 1996) (holding child care worker entitled to qualified immunity in § 1983 action where he or she removes child on reasonable suspicion of child abuse); cf. 42 Pa. Cons. Stat. § 6324 and 23 Pa. Cons. Stat. § 6315 (providing for removing child from home only where there are reasonable grounds to believe the child suffers from injury, or is in imminent danger of injury from her surroundings); Myers, 810 F.2d at 1462–63 (noting parental liberty interest in maintaining integrity of family unit is not a clearly established right where there is a "reasonable suspicion" that abuse may have occurred).

Before the interviews, Danovsky possessed a six-fold hearsay report by an anonymous informant stating that the mother had told a friend that Dr. Croft had abused Chynna and that Chynna had recently been put out of the house naked, walked several miles, was found by a neighbor, and said she was sleeping with her parents.[5]

and arbitrarily separate parents from their children; or to deprive children of their liberty interests in continued companionship with their parents.

[5]The anonymous tip reported that "[T]he mother told a friend. . ." of sexual abuse. Subsequently, the information went

Dr. Croft confirmed that an incident bearing only the barest resemblance to the anonymous tip had happened. Far from corroborating the anonymous tip, the Crofts' statements raised serious questions about the veracity of the informant. An anonymous tip may justify investigation but will not provide reasonable grounds for removal of a family member absent independent, articulable criteria of reliability; and certainly not when all evidence is to the contrary. Cf. Alabama v. White, 496 U.S. 325, 328, 110 S.Ct. 2412, 2415 (1990) (anonymous tip, absent sufficient indicia of reliability, will not support reasonable suspicion necessary to justify stop-and-frisk); United States v. Roberson, 90 F.3d 75, 78 (3d Cir. 1996) (anonymous tip that only contains information readily observable at the time the tip is made does not supply reasonable suspicion to stop).

Danovsky was entitled to view the statements of an alleged perpetrator skeptically. She was not, however, entitled to rely on the unknown credibility of an anonymous informant unless she could corroborate the information through other sources which would have reduced the chance that the informant was recklessly relating incorrect information or had purposely distorted information. See Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 2331 (1983) (anonymous tip, without other indicia of

_____

from the informant, to Childline, to Gerald Sopko, to Barbara Jollie, to Danovsky. We recognize that child abuse will often be reported anonymously. We additionally realize that such hearsay may often be the only available evidence to alert the child abuse investigators. Anonymous informants, such as those who report suspected abuse on the Childline, are undoubtedly important in policing "invisible crimes" like child sexual abuse.

9

reliability, does not establish probable cause for search warrant).

Danovsky, in her deposition testimony, pointed to what she called "red flags" -- statements given during the interviews which raised questions in her mind about whether the tip was true -- as further justification for forcing Henry Croft from his home. The red flags cited by Defendants are incapable of providing the necessary reasonable grounds. For example, at one point during the interview, Dr. Croft told Danovsky that he had applied vaginal creams to Chynna when she had a rash, which Danovsky interpreted to mean that he regularly gave his daughter vaginal exams. Likewise, Danovsky's reliance on supposed inconsistencies between the statements of Carol and Dr. Croft is without foundation. None of the cited inconsistencies is evidence of child sexual abuse, nor did any of the statements in any way confirm the allegations of the anonymous tip. Even considered together, minor inconsistencies which provide no affirmative evidence of sexual abuse cannot alone establish the objectively reasonable grounds necessary to remove a family member from the family unit.

Most damaging to Defendants is Danovsky's deposition testimony that, after the interviews, she had no opinion one way or the other whether sexual abuse had occurred. Alternatively, Danovsky testified that she did not have enough information to make a determination and that further investigation was required. Under either statement, Danovsky did not have reasonable

10

grounds, to any degree of certainty, that Chynna was sexually abused or was in imminent danger of abuse. She possessed no evidence of abuse beyond an anonymous tip. Danovsky had no physical evidence of sexual abuse with which to base an opinion. She was merely presented with an anonymous tip relating an incident which was reasonably explained by the accused parents. Record evidence establishes that Danovsky lacked any objective evidence of sexual abuse, and, indeed, that she had no belief that such abuse had occurred.

Considered in light of the circumstances surrounding the ultimatum, Danovsky's conduct was an arbitrary abuse of government power. Based on her lack of an opinion regarding whether sexual abuse had occurred, we hold that she lacked objectively reasonable grounds to believe the child had been sexually abused or was in imminent danger of sexual abuse. Combined with the total absence of objective evidence which would support a belief that sexual abuse had occurred, we hold that Danovsky's conduct will certainly not support the grant of summary judgment in the Defendants' favor. Because the Crofts did not cross-file for summary judgment, we, sitting as a court of review, must remand the cause to the district court for further proceedings.[6]

---

[6]While Judge Becker joins in the preceding portions of the opinion, he is not prepared at this juncture to hold that Danovsky's conduct violated the Crofts' constitutional rights, or that, on remand, the Crofts are entitled to an automatic summary judgment on their claims, as the majority opinion seems to suggest.

11

III.

We will reverse the district court's entry of summary judgment.[7]

Costs will be taxed against the Appellee.

---

[7]The Crofts have also raised questions of fact, *inter alia*, whether an unconstitutional custom or policy existed; whether the relevant final policy makers for WCCYS and the County consciously or deliberately enacted, or acquiesced in, the custom or policy at issue; and, whether the custom or policy caused the violation of the Crofts' constitutional rights.