Michael **ZAPPALA** and Veronica Zappala, individually and as parents and legal guardians of Anthony Zappala and Micha Zappala, infants under the age of Eighteen Years, Plaintiffs,

v.

Linda **ALBICELLI**, Margaret Colligan, Richard E. Parisi, Jerome F. Melvin, Liverpool Central School District, Catherine Haas, Chris Larkin, Thomas Albani, Bonnie Englebrecht, Robert J. Stone, Carl W. Dengel II, Rene Roberts, M.C. Romas, Peter Van Patten, John C. Dillon, Jon A. Gerber, and Onondaga County, Defendants.

No. 94–CV–275 (FJS/GJD).

United States District Court, N.D. New York.

Feb. 10, 1997.

Thorn and Gershon (Arthur H. Thorn, Mario D. Cometti, of counsel), Albany, NY, for Plaintiffs.

Jon A. Gerber, County Attorney, County of Onondaga Department of Law (Christina M. Pezzulo, of counsel), Syracuse, NY, for County Defendants.

Sugarman, Wallace, Manheim & Schoenwald (Donald L. Schoenwald, of counsel), Syracuse, NY, for Liverpool Central Schools Defendants.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, District Judge.

### Introduction

This civil rights action brought pursuant to 42 U.S.C. § 1983 arises out of alleged improprieties surrounding the Defendants' investigation of possible sexual abuse of Plaintiff Micha Zappala by her father, Plaintiff Michael Zappala. Plaintiffs make a variety of claims, all of which are premised either on the temporary removal of Micha Zappala from her parents' custody based on a report of sexual abuse, or the subsequent child neglect and abuse petition brought against Michael and Veronica Zappala.

The plaintiffs are Micha Zappala, her brother Anthony, and her parents, Veronica and Michael. The Defendants are: (1) the employees of the Liverpool School District who were involved in making the report of child abuse, and the Liverpool School District itself ("the Liverpool Defendants"), and (2) various employees of Onondaga County, including social workers, police officers, and county attorneys, who processed the child abuse report, took part in the temporary removal of Micha, and decided to pursue a child neglect petition against Micha's parents ("the County Defendants").[1]

### Factual Background [2]

The material facts of this case are not in dispute. In January 1992, Plaintiff Micha Zappala was a ten-year-old with Downs Syndrome. For three years prior to the incident in question, Micha's certified special education teacher was Defendant Linda Albicelli and her speech therapist was Defendant Margaret Colligan. Both of these Defen-

---

[1]. Defendants Albicelli and Colligan were Micha's teacher and speech therapist who reported the facilitated messages to the Principal. The Principal, Defendant Parisi, forwarded the reports to the NYSCACR. Defendants Larkin, Haas, Engelbrecht, and Stone, were all social workers who either received the report or took part in the investigation of the alleged child abuse. Defendants Dengel, Van Patten, Romas, Dillon, and Roberts were the Police Officers who took part in either assisting the investigation or taking initial custody of Micha.

[2]. This factual background is a composite of the undisputed facts as detailed in the Plaintiffs and Defendants submissions and the record before the Court.

dants were employed by the Liverpool School District.

Ms. Albicelli started using facilitated communication with Micha in October 1991.[3] Ms. Albicelli's technique for facilitating with Micha was to touch the underside of Micha's forearm or hold her sweater from the top of the forearm sleeve while Micha pointed to letters on an alphabet board, a Canon Communicator,[4] or a computer. Ms. Albicelli notified Micha's parents in October of 1991 that she intended to use facilitated communication, and some time in the beginning of December 1991 she provided them a demonstration of facilitated communication.

On Monday, January 6, 1992, following Christmas vacation, Ms. Albicelli contends that she and Micha were utilizing facilitated communication when Micha communicated that her father "does nasty things to [her]." Ms. Albicelli further contends that on the next day while utilizing facilitated communication, Micha communicated the following: "I don't want to get Dad in trouble. I love him and he loves me. I don't want him to go to jail. He said keep our secret or I'll beat you. I don't want to be beaten. I'll tell Mom, she'll make him stop." On January 8, 1992, Ms. Albicelli asked Ms. Colligan to interview Micha. Again using facilitated communication, Micha allegedly expressed similar complaints to Ms. Colligan. Ms. Colligan and Ms. Albicelli brought the alleged disclosures to the attention of Defendant Principal Parisi. Mr. Parisi then telephoned the Onondaga County Child Abuse Hotline and reported the allegations. This report was relayed to the New York State Child Abuse Central Registry ("NYSCACR").[5] NYSCACR forwarded the information reported to them to Onondaga County for investigation.[6] On January 9, 1992, Defendant Larkin, a supervisor at the DSS, directed Defendant Catherine Haas, a DSS caseworker, to commence an investigation of the Zappala matter.[7] Ms. Haas contacted Defendant Sergeant Peter Van Patten in the Sheriff's Department Abused Persons Unit ("APU") to begin investigative coordination. Sergeant Van Patten assigned Deputy Sheriff Carl Dengel to the investigation. Because it was late in the day on January 9 and Micha would be leaving school for home soon, Ms. Haas and Deputy Dengel agreed to interview Micha at 10:00 a.m. on Friday, January 10, 1992.

When Ms. Haas and Deputy Dengel arrived at the school the next morning, they spoke to Ms. Albicelli, who reported that on January 9, Micha had again communicated by facilitation that she had been abused by her father on or about December 12, 1991.[8] Ms. Haas and Deputy Dengel then proceeded to interview Micha with Ms. Albicelli facilitating. Micha allegedly explicitly described abuse by her father including forced oral and vaginal contact with his genitals.

3. "FC is a technique by which a person called a 'facilitator' supports the hand or arm of a communicatively impaired individual, enabling the person to extend an index finger in order to point to or press the keys of a typing device and thus to communicate. It has been used primarily as a tool to communicate with people afflicted with autism, cerebral palsy, and Down's Syndrome, as well as others labeled 'intellectually or developmentally impaired.' The technique was apparently first introduced in the United States in 1989." *Callahan v. Lancaster–Lebanon Intermediate Unit 13*, 880 F.Supp. 319, 324 n. 4 (E.D.Pa. 1994).

4. A Canon Communicator is a small mechanical device containing an alphabet keyboard that, when typed, produces a ticker tape record of the letters typed.

5. At the time and to date, the New York State Child Abuse Central Registry accepts disclosures made through facilitated communication.

6. The Hotline report received by to Onondaga County DSS containing the above quoted information, indicated that the information was produced as a result of facilitated communication, at least in part, and also noted that Micha has suffered from two or three vaginal infections during the school year.

7. The Department of Social Services Child Protective Service is responsible for investigating all reports of abuse, and for providing protective services to the potential victims of abuse. The Onondaga County Sheriff's Department (Abused Persons Unit) does not provide protective services, but evaluates the situation for potential criminal prosecution, and where necessary, emergency removal of the child from the home.

8. Micha was sent home sick at 11:30 a.m. on December 12, 1991, and was absent from school for three days thereafter.

Ms. Haas and Deputy Dengel returned to their respective offices to discuss the interview with their supervisors, Sergeant Van Patten and Ms. Larkin. Thereafter, Ms. Larkin and Sergeant Van Patten spoke by telephone. Based on the information acquired and § 1024 of the Family Court Act, § 417 of the Social Services Law, and Child Protective Services protocol, Sergeant Van Patten determined that Micha must be taken into protective custody.[9] Sergeant Van Patten dispatched Deputies Carl Dengel and Mark Romas to the school to retrieve Micha, Ms. Albicelli, and Ms. Colligan, and bring them to the APU offices. Meanwhile, Sergeant Van Patten communicated his actions to Larkin, and set about trying to locate Micha's parents.

Upon the arrival of Micha, Ms. Albicelli, and Ms. Colligan at the APU offices, Sergeant Van Patten directed Defendant Deputy Renee Roberts to interview Micha, and Deputy Romas to take a statement from Ms. Colligan and Ms. Albicelli. After Michael and Veronica Zappala arrived, Deputy Romas interviewed Veronica and Deputy Dengel interviewed Michael. The Zappalas contacted their attorney, Mr. Kimpel, who arrived during the interview process. Mr. Kimpel approved Michael and Veronica's sworn statements before they signed them.

The interviews were completed at approximately 5:30 p.m. that evening on January 10. Veronica Zappala suggested that Micha be returned to the Zappala's custody on her promise that Michael Zappala would vacate the family premises. Haas telephoned her evening supervisor, Defendant Bonnie Engelbrecht, to advise her of the situation, and then informed the Zappalas that because Micha had been placed in protective custody by a police officer based upon abuse allegations, she could only be returned home upon a court order. Ms. Haas then delivered the child to a foster home.

On Monday, January 13, 1992, Veronica and Michael Zappala filed an application for the return of Micha pursuant to section 1028 of the Family Court Act.[10] An "Imminent Danger Hearing" was held that afternoon before Family Court Judge Hedges. At the hearing, the parties entered a stipulated order of protection which provided for Micha to be returned to her mother's custody on the condition that her father not be allowed any contact with Micha and only supervised contact with her brother Anthony.[11] The parties also stipulated to a physical examination of Micha before her discharge from foster care. That same day, a Petition alleging sexual abuse of Micha and neglect of Anthony was filed in Onondaga County Family Court. Michael and Veronica Zappala were served with the summons and petition on January 14, 1992.

The next day, January 14, 1992 Haas brought Micha to Dr. Ann Botash, a pediatrician to have her examined.[12] Dr. Botash observed that Micha's vaginal area was scarred and sensitive, so as to make examination difficult, and observed evidence of a chronic yeast infection. Veronica Zappala

---

9. Defendants contend that the decision was based upon the following factors: (1) Micha's spontaneous, repeated, and increasingly explicit sexual abuse disclosures over a period of five days; (2) Micha's disclosure that she told her mother and her mother did not believe her; (3) Micha's three vaginal infections over the past year, malodor, and occasionally soiled panties; (4) Micha had disclosed to more than one individual; (5) Micha was fearful and had a change in behavior; (5) Albicelli, who had taught Micha for three years, reported that she was capable of reading on a fourth grade level; (6) a medical examination had not been conducted; (7) Micha was handicapped with limited skills; (6) Micha would otherwise have been sent home for the weekend where she might reveal her interview with Dengel and Haas and be subject to abuse over the course of the weekend without even the benefit of the oversight of school personnel; and (7) there was insufficient time to locate and interview the parents prior to school dismissal.

10. § 1028 of the Family Court Act provides for an immediate hearing within three court days to determine whether a child temporarily removed from his/her parents should be returned to their custody. Fam.Ct. Act § 1028 (1996).

11. During the course of the family court proceeding, the Order of Protection was amended to allow unsupervised contact between Michael and Anthony Zappala and supervised contact between Michael and Micha.

12. Veronica Zappala was present during the entire examination.

declined further testing to determine the source of Micha's repeat yeast infections.

On January 15, the court appointed a law guardian for Anthony and Micha. At that time, the law guardian and the Zappalas stipulated to a further physical examination of Micha with a physician of Zappala's own choosing present.[13] This second examination was performed on January 21, 1992 by Dr. Botash. Again, Veronica Zappala was present during the entire exam and she declined further testing for Micha.[14] After this examination, Botash determined that the examination was inconclusive for sexual abuse, and no further medical testing took place.

During the pendency of the neglect proceeding, the Zappalas challenged the legal admissibility of facilitated communication. The Family Court held a hearing on the matter, resulting in a decision rendered on September 16, 1992, granting the Zappalas' motion to preclude the use of evidence derived from facilitated communication in the neglect proceeding.

On September 24, the County withdrew the neglect petition. The matter was dismissed, without prejudice.[15] No hearing on the merits was ever conducted.

This matter is presently before the Court upon (1) the County Defendants' motion for summary judgment; (2) the County Defendants' motion to stay all proceedings pending resolution of its summary judgment motion, (3) Plaintiffs' motion to strike the County Defendants' answer, (4) Plaintiffs' motion to compel discovery, and (5) both parties' motions for sanctions, attorney's fees, and costs.[16]

### Discussion

In this action, the Plaintiffs bring fifteen different claims against fifteen individual Defendants and two municipal Defendants.[17] The crux of all the claims centers on the propriety of using facilitated communication in child welfare decisions. If, on January 6, 1992, Micha Zappala had verbally told her teacher that her father was sexually abusing her, it is unlikely that this action would have been brought. Thus, nearly every claim made by the Plaintiff turns on whether the County and County officials' reliance on facilitated communication, together with the other circumstances in the case, was unfounded and therefore violated the Plaintiffs' constitutional rights. The fifteen claims of the Plaintiff can be grouped for analysis in the following way: (1) the § 1983 claims which allege individual violations of the Plaintiff's First, Fourth, Fifth, and Fourteenth Amendment rights premised on the removal of Micha from the family home and the bringing of the neglect petition; (2) a § 1983 claim alleging that all the Defendants conspired to violate Plaintiff's constitutional rights; (3) a *Monell* claim brought against the County for failure to train; and finally (4) the § 1983 claim alleging that all the Defendants caused Micha to be medically tested without her parents' consent in violation of their Constitutional rights.

### I. Individual Constitutional Claims

As stated, the single underlying premise of each of these claims is that facilitated communication lacks any credibility and that the Defendants' reliance on it given the other circumstances of the case violated the Plaintiffs' Constitutional rights. The Court will first address the eleven Defendant County officials' motion for summary judgment on the basis of qualified immunity.

#### 1. Qualified Immunity

Plaintiffs' § 1983 claims arise out of two sets of factual circumstances. One group of claims allege a violation of various constitu-

13. Also on January 15, Haas attempted to interview Anthony Zappala at his school. Anthony declined to speak with Haas on the advice of the family attorney.

14. No County representative was present, nor was any other physician present.

15. The Zappalas never made a formal written motion seeking dismissal or summary judgment.

16. The Liverpool Defendants are not associated with the present summary judgment motion.

17. Eleven of those Defendants, along with the County of Onondaga, bring the present motion for summary judgment pursuant to Fed.R.Civ.P. 56.

tional rights based on Micha's temporary removal from her home. The other group of § 1983 claims allege malicious prosecution against various Defendants based on the decision to bring the child neglect petition. Since both groups of claims are premised on the Defendants' lack of probable cause at the time they acted, January 10–13, 1992, the Court will analyze the availability of qualified immunity as to the County Defendants at that point in time.

Generally speaking, qualified immunity shields government officials from liability arising from their official conduct insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir.1995) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The qualified immunity standard requires a two-prong inquiry. The first prong inquires whether the right claimed to have been violated was clearly established at the time the Defendants acted. *Rodriguez*, 66 F.3d at 476 (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991)). If the right is clearly established, the second prong of the inquiry asks whether the Defendants' conduct was still objectively reasonable given the circumstances. *Lennon v. Miller*, 66 F.3d 416, 423–24 (2d Cir.1995)

### 2. Clearly Established Prong

The purpose of the first prong of the qualified immunity test is to ask whether the Defendant official should have been on notice that his conduct could implicate a "clearly established" constitutional or federal statutory right. *See Shechter v. Comptroller of the City of New York*, 79 F.3d 265, 270 (2d Cir.1996) ("the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," *quoting Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). The Second Circuit has suggested that the "clearly established" prong may be determined upon consideration of three factors: (1) whether the right in question was defined with "reason-able specificity;" i.e., the right must be defined narrowly enough so that a reasonable Defendant official would have truly been on notice of the relation between his conduct and the relevant case law; (2) whether the decisional law of the Supreme Court and the Second Circuit at the time of the alleged violation supported the existence of the right in question, and (3) whether, given the state of the law at the time of the alleged violation, a reasonable Defendant official would have understood that his or her acts were unlawful. *Shechter*, 79 F.3d at 271 (citations omitted).

█ In the present case, it is well established that a parent has a constitutional right to the custody of his or her children. This right has been found to exist under the First, Fourth, Fifth and Fourteenth Amendments. *See Roberts v. United States Jaycees*, 468 U.S. 609, 620, 104 S.Ct. 3244, 3250–51, 82 L.Ed.2d 462 (1984) (recognizing that family relationships implicate a protected First Amendment associational right); *van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 867 (2d Cir.1990) (finding that the state's assumption of custody of the child is a seizure under the Fourth Amendment); *Smith v. Org. of Foster Families For Equality and Reform*, 431 U.S. 816, 842, 97 S.Ct. 2094, 2108, 53 L.Ed.2d 14 (1977) (recognizing that a procedural due process "liberty" interest does exist in maintaining family relationships). However, in 1992, it was and still is equally well established in Second Circuit case law that government "officials may temporarily deprive a parent of custody in emergency circumstances without parental consent or a prior court order." *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987) (citations omitted). Furthermore, in 1992 it was established law that such action was appropriate if the "officials have been presented with evidence of serious ongoing sexual abuse and therefore have reason to fear imminent recurrence." *Id.* at 922.

Here, the Defendant officials relied on what they believed to be evidence of serious ongoing sexual abuse by Micha's father.[18] It certainly was not clearly established law in

---

18. *supra* note 9.

January 1992, that such allegations of sexual abuse as were reported here, even though communicated by means of an experimental communication technique such as facilitated communication, were necessarily unreliable. Nor was it clearly established law that such reports, taken together with the other existing circumstances, would be insufficient to trigger the type of emergency warranting immediate removal of a child from her home.[19] Likewise, it was not clearly established at that time that bringing a subsequent neglect petition as a result of such information would violate the Zappala's Constitutional rights.[20] Thus, the Court finds that the Defendants could not have been on notice that they were engaging in potentially unconstitutional conduct. As such, the County officials are entitled to qualified immunity based on the first prong of the qualified immunity standard.

### 3. Objective Reasonableness Standard

■ Even assuming the Defendants are not entitled to qualified immunity on the first prong of the standard, an analysis of the second prong of the qualified immunity standard yields the same result. "The Supreme Court has held that the objective reasonableness standard was specifically designed to

'permit the resolution of many insubstantial claims on summary judgment.'" *Lennon,* 66 F.3d at 421 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). "If there is no dispute about the material facts, the district court should assess the reasonableness of the Defendant's conduct under the circumstances presented...." *Id.*

As stated, for the most part, the parties do not dispute the events that occurred, only what interpretation should be given to them. Under this prong, the Court must determine whether reasonable County officials could disagree about whether the temporary removal of Micha and initiation of a petition for neglect was a violation of the parents' constitutional rights based on the information available to the defendants. *See Lennon,* 66 F.3d at 424. Both sides have presented evidence with respect to the reliability of facilitated communication and the propriety of the defendants' actions in this matter.[21] The apparent disagreement between the experts over whether facilitated communication is a reliable form of communication, in and of itself, demonstrates that reasonable officials could disagree about the propriety of the Defendants' actions which were based substantially on reports derived from facilitated communication.[22] These reports formed the

---

**19.** *supra* note 9.

**20.** Plaintiffs bring a § 1983 claim for malicious civil prosecution under the Fifth Amendment against Haas, Larkin, Albini, Englebrecht, Stone and Gerber for bringing the neglect petition in Family Court.

As a threshold matter, it is not clear that malicious *civil* prosecution can give rise to a cognizable § 1983 claim. Other Circuits that have considered this issue have held that a valid § 1983 claim for malicious prosecution exists only with respect to criminal proceedings. *See McMaster v. Cabinet for Human Resources,* 824 F.2d 518, 522 (6th Cir.1987); *Cloutier v. Epping,* 714 F.2d 1184 (1st Cir.1983). In *Easton v. Sundram,* the Second Circuit in considering this issue stated: "[w]e do not hold that civil malicious prosecution can never give rise to a cause of action under § 1983, although we suspect it normally will not." 947 F.2d 1011, 1018 (2d Cir.1991). The Second Circuit indicated that in order to transform a civil malicious prosecution claim to a constitutional cause of action, plaintiff would have to allege some official conduct which shocked the conscience. *Id.* The Court need not reach this issue, however, in order to determine the availability of qualified immunity.

**21.** Defendants submitted affidavits in support of their motion from Dr. Donald L. Cardinal, Timothy J. Erwin, Carol J. Johnston, Dr. Eileen Treacy, and Margaret A. Burt who are experts in their respective fields of special education, police investigation of child abuse and sex crimes, child abuse investigations, child welfare investigations, and prosecution of sex crimes. In sum, these affidavits express the opinion that the Defendants' actions taken in response to the facilitated communication were entirely appropriate and reasonable, and in some cases professionally and ethically mandated. (Cardinal Aff. at 11)

The Plaintiffs, on the other hand, submitted affidavits by Dr. Howard Shane, Dr. Gina Green, Daniel L. Guiney, and Frank Harrigan, who are experts in their respective fields of speech-language pathology, developmental disabilities, police investigation, and sex abuse investigation. In sum, these affidavits attempt to cast doubt on whether facilitated communication is a viable form of communication.

**22.** The Constitutional claims based on the removal of Micha from her home and based on the filing of the neglect petition both turn on whether the Defendant county officials had probable

basis of the probable cause which triggered the chain of events which caused the temporary custody deprivation at issue, and also triggered the child neglect petition brought against the Zappalas. It seems clear that given all the circumstances present, if Micha had verbally communicated the allegations which were elicited through facilitated communication, all the individual Defendants would be entitled to qualified immunity.[23] The gravamen of the Plaintiffs' claim, however, is that facilitated communication is so fundamentally unsound, relying on it to seize Micha was analogous to having no evidence at all. Even if the Plaintiffs are correct in their assessment of the reliability of facilitated communication,[24] at the time the Defendant County officials acted, its reliability was not known to be discredited, nor was there any guiding precedent in the then existing Second Circuit and Supreme Court case law. Thus, based on the record before the Court, it is clear that the Defendants' actions were objectively reasonable, as a matter of law. As such, the Court finds that the individual County Defendants are entitled to qualified immunity as a matter of law under the second prong of the qualified immunity standard, as well.[25]

## II. § 1983 Conspiracy Claim

■ The only evidence offered by the Plaintiffs of a separate conspiracy are the alleged unconstitutional acts themselves. Since the Defendants are entitled to qualified immunity on all the individual Constitutional claims, a separate conspiracy claim based

only on the exact same conduct fails as well. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 119–20 (2d Cir.1995). Thus, Plaintiffs § 1983 conspiracy claims fail as a matter of law.

## III. *Monell* Claims

■ Plaintiffs allege that Defendant Onondaga County is liable under § 1983 for violation of the Plaintiffs' Constitutional rights because the County had custom or policy of inadequately training their police officers and social workers concerning facilitated communication. Plaintiffs further argue: (1) that the County is liable because it had no policy for joint investigations with the Sheriff's Department and the Department of Social Services, (2) that the County is liable for failing to review, assess, or evaluate the Abused Person's Unit ("APU") since 1979, (3) that the APU personnel receive no specialized training in how to deal with the developmentally disabled, (4) that the Sheriff's department is generally untrained, (5) and that the failure to conduct an internal review of this incident is evidence of a general unconstitutional policy.

■ Municipalities are liable for the unconstitutional acts of non-policy making municipal employees only when the employee's acts are the direct result of a municipal custom or policy. *See Monell v. City of New York Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). A claim of "inadequate training" will trigger municipal liability only when "the failure to train amounts to deliberate indif-

---

cause to believe that sexual abuse had occurred. Thus the objective reasonableness of all the individual claims turns on whether facilitated communication together with the other information available support a finding of probable cause, the very issue addressed in both sides' expert affidavits.

23. See *Gottlieb v. County of Orange,* 84 F.3d 511, 520 (2d Cir.1996) (finding that it is objectively reasonable to promptly remove a child from her home based on reports of "ongoing sexual abuse").

24. The viability of facilitated communication as a scientifically sound communication technique is still under much dispute. *See* Nancy M. Maurer, *Facilitated Communication: Can Children With Autism Have A Voice In Court?,* 6 Md.J.Contemp.Legal Issues 233 (1995).

25. Plaintiffs claim that the Defendants deliberately withheld fourteen Cannon communicator tapes made by Micha during the investigation which were exculpatory in nature and would support a finding that the Defendants' conduct was unreasonable. The tapes themselves reveal that this argument is at best specious and perhaps even frivolous. While the "statements" cited by the Defendants may have some relevance to the overall reliability of facilitated communication, they can not be considered exculpatory, nor do they affect the reasonableness of the Defendants' response to Micha's "clear" facilitated statements, i.e., that her father had oral sex with her, and threatened to beat her if she told anyone.

ference to the rights" of those with whom the employees will come into contact. *Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Deliberate indifference implies that the city made a "deliberate choice" not to train its employees from among various alternatives. *Id.* at 389, 109 S.Ct. at 1205. Furthermore, liability will not attach unless the training inadequacy is closely related to the ultimate injury. *Id.* at 391, 109 S.Ct. at 1206.

Plaintiffs allege that the Onondaga County DSS, APU, and Sheriff Department failed to train its personnel in facilitated communication causing the specific alleged violations of the Plaintiffs' constitutional rights. Plaintiffs fail to establish a *Monell* claim for several reasons,[26] but most importantly, there is no causal link between the alleged policies and the alleged deprivation, as required by *Canton*. The underlying premise of the Plaintiffs' constitutional deprivation is that facilitated communication is a hoax. Thus, any training received by the Defendants in facilitated communication prior to January 1992 may have made them more knowledgeable about facilitated communication, but would not have revealed that facilitated communication was patently false, as Plaintiffs contend.[27] Therefore, the Court finds that Onondaga County's policy of failing to train its officials in facilitation, even if true, could not have caused the specific deprivation alleged by the Plaintiffs. Likewise, all of the other "policies" alleged by the Plaintiffs lack a causal link as well. As such, the Plaintiffs have not met their summary judgment burden of demonstrating that there is a material issue of fact as to their alleged *Monell* claims, and therefore, the County of Onondaga is entitled to summary judgment as a matter of law.

## IV. Unauthorized Medical Testing:

■ Plaintiffs also allege that each Defendant violated their constitutional rights by allowing Micha to be medically examined without their consent. Although the Plaintiffs do not explicitly cite it, they apparently rely on their Fourteenth Amendment due process liberty interest in making decisions about their children's medical care, *see Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979), and their parental assertion of Micha's Fourth Amendment right not to be subject to an invasive bodily exam. *See Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972).

■ Generally, even when the state takes temporary custody of child in "emergency situations," an investigative medical examination may not be undertaken without parental notice and judicial authorization. *See van Emrick*, 911 F.2d at 863; *Tenenbaum v. Williams*, 862 F.Supp. 962, 972 (E.D.N.Y. 1994).

Here, the Defendants have offered evidence that the medical examination of Micha was undertaken pursuant a judicial order of the Family Court, was stipulated to by the Zappalas, and was conducted in the presence of Micha's mother.[28] (*See* Botash Aff.Ex. AA; Family Court Transcript, Ex. Y). Plaintiffs have offered no evidence refuting these facts nor do they even deny them. Thus, because there was both parental notice and judicial authorization of Micha's medical examinations, Plaintiffs have not asserted a constitutional injury as to those examinations. Therefore, Defendants are entitled to summary judgment on this claim as a matter of law.

## V. Other Motions

1. *Defendants' Motion to Stay Proceedings (Discovery) and Plaintiffs' Motions to Compel Discovery, and to Strike Defendants' Answer*

Because the Court is granting the County Defendants' motion for summary judgment

---

**26.** "The simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy cause the plaintiff's injury" *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993).

**27.** Furthermore, even the assertion of this policy itself is false, because the evidence indicates that the Defendants Haas, Larkin, Albani, Roberts, Romas and Van Patten all had some training on facilitated communication prior to the incident in question. (*See* Pezzulo Statement p. 29–30; Ex. DDD at 10, 1n 1–9; Ex. RR at 18–22)

**28.** According to Dr. Botash's testimony, Micha's mother refused consent to certain tests recommended by the doctor, which were not undertaken. (*See* Botash Aff.Ex. AA at 13)

as to all of the Plaintiffs' claims, the Defendants' motion to stay discovery and the Plaintiffs' motion to compel discovery and to strike Defendants' answer are dismissed as moot.

### 2. Plaintiffs' Motion for Sanctions, Attorneys' Fees and Costs Associated with Bringing the Motion to Compel Discovery

■ Plaintiffs move for sanctions, attorney's fees and costs associated with bringing their motion to compel discovery, pursuant to Fed.R.Civ.P. 37(d). They allege that the Defendants willfully failed to comply with discovery demands because they took four months to respond to the Plaintiffs' interrogatories, and that when served, their responses were inadequate.

Fed.R.Civ.P. 37 provides in part:

if a party ... fails ... to serve answers or objections to interrogatories ... the court in which the action is pending on motion may make such orders in regard to the failure as are just.... In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that circumstances make the award of expenses unjust.

Fed.R.Civ.P. 37(d) (1996). The appropriateness of a given sanction is not guided by any clearly defined rule or doctrine but should be just, in accordance with the terms of Rule 37(d), and should serve the guidelines outlined in *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67 (2d Cir.1988). *Williams v. National Housing Exchange Inc.*, 165 F.R.D. 405, 408 (S.D.N.Y.1996). *Update Art* outlined three purposes of Rule 37 sanctions: (1) they ensure that a party will not benefit from failure to comply with discovery requests, (2) they are specific deterrents in a case to a particular party, and (3) they have "a general deterrent effect on the case at hand and on other litigation...." *Id.* (citing *Update Art*, 843 F.2d at 71).

Here, the record indicates that the Defendants have made a good faith effort to comply with the Plaintiffs' voluminous discovery requests, that the Defendants have not "failed" to answer the interrogatories as required under Rule 37(d), and that the Defendants' interrogatory responses were timely under the pre-trial management order. The Court further notes that the Plaintiffs took three months to respond to Defendants' interrogatories and completely failed to respond to the Defendants' requests for clarification on some of those responses. As such, the Plaintiffs are not entitled to Rule 37(d) sanctions, and their motion is denied.

### 3. County Defendants' Motion for Sanctions, Attorneys' Fees and Costs

■ The County Defendants move for an award of sanctions against the Plaintiffs based on the Plaintiffs' motion for sanctions which the Defendants characterize as frivolous. The Defendants do not cite to the authority under which they seek sanctions, so the Court will assume that they do so under the inherent discretionary authority of the Court.

■ A federal district court has the inherent authority to assess attorney's fees for willful disobedience of a court's order, or when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). The Defendants have offered no facts supporting a finding that Plaintiffs have brought their motion in bad faith, vexatiously, wantonly, or for oppressive reasons. As such, the Court denies their motion for sanctions.

### Conclusion

The Court has reviewed all the parties' submissions, supporting evidence, and the applicable law and finds that the County Defendants are entitled to qualified immunity, and that the Plaintiff has failed to demonstrate an issue of material fact as to the County's municipal § 1983 liability. Therefore, it is hereby

ORDERED, that the County Defendants' motion for summary judgment is GRANTED, and all the claims against Catherine

Haas, Chris Larkin, Thomas Albani, Bonnie Englebrecht, Robert Stone, Carl W. Dengel, II, Rene Roberts, M.C. Romas, Peter Van Patten, John C. Dillon, Jon A. Gerber and Onondaga County are DISMISSED. It is further

ORDERED, that County Defendants' motion to stay proceedings is DENIED as moot. It is further

ORDERED that Plaintiffs' motion to strike the Defendants' answer is DENIED as moot. It is further

ORDERED that Plaintiffs' motion for sanctions, attorneys' fees and costs is DENIED. Finally, It is further

ORDERED that Defendants motion for sanctions, attorneys' fees and costs is DENIED.

**IT IS SO ORDERED.**