Joshua J. COVELL, Katrina M. Barr, Branden M. Barr, and Jonathan L. Johnson, Infants Under the Age of Eighteen Years by and Through Their Parent and Natural Guardian Deborah Barr JOHNSON; Deborah Barr Johnson; and Walter Johnson, Plaintiffs,

v.

COUNTY OF OSWEGO; Steven Rose; Colleen A. Kehoe; Mary Moe; Oswego County B.O.C.E.S.; Tonya Coe; Dawn Butler; Mary Winston Morton, aka Missy Morton; Douglas Biklen; and Syracuse University, Defendants.

No. 94CV0223(LEK)(RWS).

United States District Court, N.D. New York.

Sept. 5, 2001.

Alan S. Zwiebel, Zwiebel, Brody Law Firm, Kingston, NY, for plaintiffs.

Lori E. Petrone, Petrone, Petrone Law Firm, Utica, NY, Ellen S. Weinstein, Pinsky Skandalis Law Firm, Syracuse, NY, for County of Oswego, Steven Rose, Colleen A. Kehoe, defendants.

Ellen S. Weinstein, Pinsky Skandalis Law Firm, Syracuse, NY, for Mary Moe, Oswego County B.O.C.E.S., Tonya Coe, Dawn Butler, defendants.

### *MEMORANDUM—DECISION AND ORDER*

KAHN, District Judge.

Presently before this Court is a motion for summary judgment filed by defendants County of Oswego, Steven Rose and Colleen A. Kehoe ("Defendants"), the only

remaining defendants in the action. For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND

Plaintiffs filed the instant civil rights complaint, pursuant to 42 U.S.C. § 1983, alleging numerous violations of their constitutional rights arising from the investigation and prosecution of child abuse complaints against plaintiffs Deborah Barr Johnson, now Deborah Ramos, ("Deborah") and Walter Johnson ("Walter"). Plaintiff Joshua Covell ("Joshua") is an autistic child of Deborah. At the time of the alleged constitutional violations, Joshua was eleven and living with Deborah, Deborah's other children and Walter, her then fiancé. He was also attending school at the Oswego County B.O.C.E.S. program.

In 1992, staff members at the school began to use a technique called "facilitated communication" with Joshua in order to treat his autism. Facilitated communication is a method by which a "facilitator" provides physical assistance to an individual thereby allowing him or her to more easily spell out words using a variety of spelling devices. It is used to give the individual more control over the movements of his or her hands while typing or indicating a message by other means.

In October of 1992, faculty and staff at Joshua's school claimed that his facilitated communications indicated that Walter was sexually abusing him at home and that his mother, Deborah, was aware of it. Accordingly, the school filed a report of suspected abuse with the New York State Central Register for Child Abuse and Neglect ("Central Register"). This report was referred to the Oswego County Department of Social Services ("Social Services"), the Commissioner of which was defendant Steven Rose ("Rose"). Defendant Colleen Kehoe, now Colleen Kehoe Warner ("Kehoe"), was the caseworker assigned to investigate the matter.

During the course of her investigation, Kehoe interviewed some of the child plaintiffs at their schools, along with school faculty and staff. During the course of those interviews, she learned that Joshua had been acting aggressively towards other children and masturbating at school. Further, she learned that "there were rumors" surrounding the possible sexual abuse of plaintiff Katrina M. Barr ("Katrina"). On November 3, 1992, Kehoe received a call from Sheriff's Department Investigator Ling ("Ling"), who had been assigned to assist her with the case. Ling informed Kehoe of an earlier interview with Katrina in which Katrina alleged that a cousin had sexually abused her.

On November 3, after having received this information, Kehoe telephoned Deborah and informed her that she had received a report concerning child neglect in her home. Deborah informed her that there were no serious problems at home. On November 9, Kehoe received a call from Joshua's teacher, who told her that Joshua was making statements that his mother was in danger from Walter. Accordingly, Kehoe conducted a home visit to Plaintiffs' residence on November 10 and attempted facilitated communications with Joshua unsuccessfully.

Kehoe spoke with an employee of the children's family doctor on November 13. She learned that several of the children were suffering from behavioral and other problems, and that the children had missed numerous appointments. In fact, she was told that the doctor would no longer treat the children because they missed so many appointments. After speaking with Kehoe, an employee of the doctor's office transmitted a report of sus-

pected child abuse to the New York State Department of Social Services.

Kehoe received another call from Joshua's teacher on November 16. In that conversation, she claimed that Joshua had indicated through facilitated communication that Walter had recently sexually assaulted him. That same day, Deborah visited Social Services. Kehoe explained to her what she had learned about the children's missed appointments and the reported sexual abuse of Katrina and told her that Social Services was concerned that someone was having sexual contact with Joshua. Deborah indicated that there was no one in the house the children could be having sexual contact with. Kehoe informed Deborah that there would be a criminal investigation of sexual abuse in her home and that she would continue to remain in contact with her.

On November 23, Kehoe's supervisor informed Kehoe that Joshua's teacher had called to inform her that Joshua was expressing through facilitated communication that he had been sexually abused the previous Saturday evening, November 21. Kehoe went to Joshua's school the next day and participated in facilitated communication with the assistance of Joshua's teacher. She claims that, when she asked what she could do to help, Joshua responded through facilitated communication "Stop Walter—quit sex." Plaintiffs dispute that Joshua responded to her question in any way.

The following day, over three weeks after receiving the initial report of suspected abuse, Kehoe went to the Plaintiffs' home, accompanied by a sheriff's deputy, in order to remove the children from the home. Rather than have the children removed, Walter asked if he could instead leave the home. After consultation with her supervisor, Kehoe granted Walter's request and informed him that he was required to stay away from the house and have no further contact with the children until the matter was resolved.

In a telephone conversation with Joshua's teacher on November 30, Kehoe informed her that Walter had been removed from the home. Joshua's teacher replied that Joshua had told her that "there was no sex" that weekend. Joshua's teacher also informed Kehoe that she was concerned by the fact that Deborah's brother Timothy Covell ("Timothy"), whom she believed to be a known sex abuser, was staying with the family. Kehoe also received a phone call on November 30 from a woman named Rita Vincent, who told her that Timothy was staying with Deborah and that he had been convicted of abusing Katrina the previous year. Finally, on December 4, Kehoe received a phone call from a woman claiming to be Deborah's sister, Becky Rawson. This woman allegedly stated that she knew that Timothy had sexually molested Katrina the previous year and that he was living in the home.

Upon further investigation, Kehoe discovered that Timothy had been arrested in September 1990 for unlawfully dealing with a child and in May 1991 for first degree sexual abuse. She also learned that he had pled guilty to endangering the welfare of a child and had been ordered not to have any unsupervised contact with Katrina. On December 11, 1992, Kehoe contacted Deborah to express her concerns about Timothy. Deborah responded by telling Kehoe that Timothy would be asked to leave the home, although she claimed that the situation was "no big deal" and that Timothy "wouldn't do anything to hurt the kids."

A physical examination of Joshua and Katrina was performed on December 1. The examination did not reveal any evidence of physical abuse. On December 22,

Kehoe filed a petition in the Family Court of Oswego County seeking to remove the children from their home because of the risks that Kehoe believed existed to the children there. The following day, December 23, the Family Court Judge issue a Temporary Order of Protection prohibiting, among other things, Walter from having contact with the children.

Per Kehoe's request, a Social Services Caseworker, Michael J. Kanalley ("Kanalley"), was assigned to the case on December 14. Following the protective order's issuance, Social Services began providing services to the household. In addition, a Family Preservation Services Counselor at Oswego County Catholic Charities ("Catholic Charities") provided services to the family. On several occasions, Kanalley made unannounced visits to the home and found Walter there. Kanalley also received a report from Catholic Charities that Walter had been in the home, although the children were not present at the time.

During the Family Court proceedings, Kehoe's investigation continued. On January 4, 1993, she received a call from William Barr ("Barr"), father of plaintiffs Katrina and Brandon Barr. Barr informed her that he believed Deborah was able to manipulate Katrina to lie about things that were happening in the home.

In a conversation with Joshua's teacher on January 15, 1993, Kehoe was informed that Joshua had not stated anything, by way of facilitated communication, about the alleged abuse. However, she was told that he had expressed anxiety about going home and had made explicit reference to sexual activity when asked what he had done over the holiday break. Moreover, Kehoe was told that when Joshua was asked what was bothering him, he had stated, "Daddy today." On March 31, 1993, following several months of legal proceedings, which included discovery demands from both parties, an extension of the protective order, granting of supervised visitation rights to Walter, and psychological evaluations of both Deborah and Walter, the Family Court petition was withdrawn. The instant motion for summary judgment was filed on February 29, 2000.

## II. ANALYSIS

### A. Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998). A fact in dispute is only material if it would affect the outcome of the suit. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A material fact is genuinely disputed only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *See id.* On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the non-moving party. *See City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 45 (2d Cir.1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon the movant's satisfaction of that burden, the onus then

shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. In doing so, the non-moving party may not "rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). The non-moving party may not "simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but "must set forth specific facts showing that there is a genuine issue of fact for trial." *First Nat'l Bank of Az. v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

Summary judgment is usually unwarranted when the defendant's state of mind is at issue. *See Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 134 (2d Cir. 2000); *Clements v. Nassau County*, 835 F.2d 1000, 1005 (2d Cir.1987). In order to raise a fact issue regarding state of mind, however, there must be solid circumstantial evidence to prove plaintiff's case. *See Clements*, 835 F.2d at 1005. "Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

## B. Plaintiffs' Claims

In this action, Plaintiffs assert a variety of claims against defendants. The veracity of a majority of these claims turn on whether Defendants' reliance on facilitated communication in the investigation and prosecution of the child abuse complaints at issue, particularly in deciding whether to separate Plaintiffs' family, was constitutionally unsound. Plaintiffs' federal claims include interference with familial and custodial rights, due process violations, harm to reputation resulting from wrongful reporting to the Central Register, and malicious prosecution. Plaintiffs' state claims include interference with custody and family relations, failure to provide family preservation services required under state law, unlawful imprisonment, libel, malicious prosecution, and negligence.

### 1. *Qualified Immunity*

Defendant Kehoe argues that she is entitled to summary judgment on the basis of qualified immunity. Qualified immunity shelters state officials performing discretionary functions from civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware. *See Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir.1995) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In the context of child abuse investigations, it has been held that social service caseworkers:

> enjoy qualified immunity from liability for damages if at the time ... it was not clear that the actions they took violated established constitutional rights, or if it was objectively reasonable for them to believe that their actions did not violate such rights as were then clearly established.

*van Emrik v. Chemung County Dep't of Soc. Servs.*, 911 F.2d 863, 865–66 (2d Cir. 1990). The court went on to acknowledge the particular value of qualified immunity to protective services caseworkers:

> If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be

accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided there is an objectively reasonable basis for their decision whichever way they make it[.]

*Id.* at 866.

As has been recently reaffirmed by the Supreme Court, courts entertaining a claim of qualified immunity must determine first whether the plaintiff has alleged a constitutional violation. *See Saucier v. Katz,* — U.S. ——, ——, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *Wilkinson v. Russell,* 182 F.3d 89, 102–03 (2d Cir. 1999). If the plaintiff does allege a constitutional violation, the Court must still grant the defendant qualified immunity if (1) the right claimed to have been violated was not clearly established at the time of the defendant's actions or (2) it was objectively reasonable for the defendant to believe that his actions did not violate the law in question. *See Wilkinson,* 182 F.3d at 103 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998)).

The Second Circuit has held that, in order for a constitutional right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Shechter v. Comptroller of the City of New York,* 79 F.3d 265, 270 (2d Cir.1996) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Circuit went on to hold that three factors are relevant when making this determination: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Id.* at 271.

If the right was clearly established at the time of the defendant's action, the Court must determine "whether the [defendant's] conduct was still objectively reasonable given the circumstances." *Id.* (citing *Lennon v. Miller,* 66 F.3d 416, 423–24 (2d Cir.1995)). Even if a plaintiff's federal rights are clearly delineated at the time of the acts complained of, qualified immunity "protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon,* 66 F.3d at 420 (quoting *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034). The objective reasonableness prong is satisfied when officials " 'of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

Since all but one of Plaintiffs' federal claims turn on whether Defendants' reliance on facilitated communication was constitutionally sound at the time they investigated the abuse in this case, the Court turns to that issue now.[1]

a. *Constitutional Validity of Defendants' Purported Reliance on Facilitated Communication*

■ It is well established that a "parent has a constitutional right to the custody of his or her children" grounded in the

---

**1.** These include interference with familial and custodial rights, substantive due process violations, harm to reputation resulting from wrongful reporting to the Central Register and malicious prosecution. In addition to the claims based on Defendants' use of facilitated communication, Plaintiffs allege a procedural due process violation not based upon the use of facilitated communication.

First, Fourth, Fifth, and Fourteenth Amendments. *Zappala v. Albicelli*, 954 F.Supp. 538, 544 (N.D.N.Y.1997) (citing cases). It is equally "well established in Second Circuit case law that government 'officials may temporarily deprive a parent of custody in emergency circumstances without parental consent or a prior court order.'" *Id.* (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987)).[2] Such action is "appropriate if the 'officials have been presented with evidence of serious ongoing sexual abuse and therefore have reason to fear imminent reoccurrence.'" *Zappala*, 954 F.Supp. at 544 (quoting *Robison*, 821 F.2d at 922).

In this case, Defendants' actions were taken because they thought they had reliable evidence of continuing and imminent sexual abuse in Plaintiff's home. This evidence consisted of the arguably unlawful extensive facilitated communications remarks made by Joshua, Joshua's aggressive and sexual behavior at school, the statements indicating that Katrina might have been abused at Plaintiffs' home, and the reports from the children's doctors declaring that they were suffering from behavioral and other problems and kept missing appointments. Plaintiff incorrectly attempts to characterize this evidence as consisting solely of facilitated communications statements.

■ In the Court's view, if Defendants had relied solely on facilitated communications evidence to either remove Joshua from his home or force Walter to leave, it would categorically hold that their First, Fourth, Fifth, and Fourteenth Amendment rights to custody of their children would have been violated. This is especially true given the unreliability of facilitated communication within the scientific community and the ease in which the facilitator and not the autistic child can control the communication output. *See Morris v. Dearborne*, 181 F.3d 657, 662 (5th Cir.1999). Particularly, the Court notes that as early as 1993, the American Academy of Child and Adolescent Psychiatrists issued a policy statement declaring that "FC is not a scientifically valid technique for individuals with autism or mental retardation ... [and] should not be used to confirm or deny allegations of abuse." *See Morris*, 181 F.3d at 662 n. 3

■ That, however, is not the situation here. In this case, Defendants relied on significant other evidence to bolster their conclusion regarding possible sexual abuse at Plaintiffs' home. This evidence, however, when examined separately from the constitutionally infirm facilitated communication statements, does not persuasively indicate that Defendants had "probable cause" or any other "reasonable" ground to initiate an emergency removal of either Joshua or Walter from Plaintiffs' home.

For example, Defendants claim that allegations of sexual abuse with regard to Katrina provided them with reasonable grounds to take actions against Plaintiffs. They cite Joshua's sexual activity and aggressive behavior at school in addition to his missed doctor's appointments as confirmation of their belief that he was subject to abuse at home. Unfortunately for Defendants, this evidence without anything more[3] fails to provide any colorable, let

---

**2.** The Second Circuit has since held that, "where there is reasonable time consistent with the safety of the child to obtain a judicial order, the 'emergency' removal of a child is unwarranted." *Tenenbaum*, 193 F.3d at 596. However, the *Tenenbaum* Court also held that the right was not clearly established prior to that decision. *See id.*

**3.** Additional evidence indicating abuse might have come from other family members, a physical exam of Joshua, to the extent it could lawfully be obtained, or medical evidence tak-

alone conclusive link, to establish a "serious fear" of sexual abuse or its reoccurrence. *See Zappala*, 954 F.Supp. at 544. Because of this, the Court holds Plaintiffs have alleged a constitutional violation of their right to familial integrity and privacy. *See Griffin v. Mcvicar*, 84 F.3d 880, 884 (7th Cir.1996).

b. *Clearly Established Prong of Qualified Immunity Claim as it Relates to Defendants' use of Facilitated Communication*

■ Even though Plaintiffs have alleged an adequate constitutional violation necessary to overcome the first portion of the Court's qualified immunity analysis as it relates to those claims based on Defendants' reliance on facilitated communication evidence, the Court still grants Defendants summary judgment based on the second prong of the qualified immunity standard. As courts in this and other districts have held when analyzing claims similar to the claims Plaintiffs assert, it "certainly was not clearly established in January 1992, that such allegations of sexual abuse as were reported ...., even though communicated by means of an experimental communication technique such as facilitated communication, were necessarily unreliable." *Zappala*, 954 F.Supp. at 545; *see also Prieto v. County of Orange*, No. 95 CIV 3755, 1997 WL 399662, at *6 (S.D.N.Y. July 15, 1997) (granting qualified immunity where case worker relied on facilitated communications, prior allegations of sexual abuse, doctor's report, and aberrant behavior of child to remove child from home). In *Zappala*, the court further stated that reliance on facilitated communication reports in conjunction with evidence indicating, in part, that the child had told her mother and other individuals of sexual abuse, that

the child's behavior had changed during the time she was allegedly abused, and that she had suffered at least three vaginal infections during the year that the abuse allegedly occurred, did not render her emergency removal from home and a subsequent neglect petition unlawful because of the "clearly established prong" of the qualified immunity standard. *See Zappala*, 954 F.Supp. at 545. Because the Court finds the allegations in this case substantially analogous to those asserted in *Zappala*, it holds, based on the "clearly established prong" of the qualified immunity standard, that defendant Kehoe is entitled to summary judgment as to each of those claims listed in footnote 1 that are based on Defendants' use of facilitated communication and it so granted.

c. *Procedural Due Process*

■ To analyze the merits of Defendants' qualified immunity defense as it relates to Plaintiffs' procedural due process claim, the Court, as already discussed, must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right. *See Saucier*, 121 S.Ct. at 2156; *Wilkinson*, 182 F.3d at 102–03. Here, Plaintiffs contend that they were denied their right to procedural due process when Defendants forced plaintiff Walter Johnson to leave the family home. As previously noted, at the time of Defendants' actions, it was well established that government officials could remove a child from his or her parent's custody "before there is a hearing held where there is an objectively reasonable basis for believing that a threat to the child's health or safety was innocent". *Gottlieb v. County of Orange*, 84 F.3d 511, 520 (2d Cir.1996) (citing *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir.1992)); *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir.1991).

en from Joshua's doctor showing signs of sexual abuse.

Under the state of the law at that time, when such a removal took place, "due process require[d] that the state procedures provide the parent an opportunity to be heard at a reasonably prompt time after the removal." *Gottlieb,* 84 F.3d at 520. New York statutory law at that time allowed for emergency removal when an employee "ha[d] reasonable cause to believe that the child [wa]s in such circumstance or condition that his continuing in said place of residence or in the care and custody of the parent or person legally responsible for the child's care present[ed] an imminent danger to the child's life or health." N.Y.Fam.Ct.Act § 1024(a) (McKinney 1992). When a child was removed under that section, the agency was required to give written notice to the parent of the right to apply under § 1028 of the Act for the child's return. N.Y.Fam.Ct.Act § 1024(b)(iii) (McKinney 1992). If the child was not returned to the home, a hearing was required to be held within three days of the child's removal. N.Y.Fam.Ct.Act § 1026 (McKinney 1992).

However, because a parent left the home instead of the child, the burden of initiating judicial review no longer fell on the government official or entity. *See Gottlieb,* 84 F.3d at 521–22. A departing parent was free to "have the agency initiate judicial review ... by writing to the agency and informing it that he intends to return to the home five days later unless the agency obtains a court order forbidding his return." *Id.* at 522. Once receiving such notice, it was "incumbent on the [agency] to secure an order enforcing his separation." *Id.* Since Defendants did not violate any of these procedures, they did not violate Plaintiffs' procedural due process rights. Consequently, Defendants are entitled to summary judgment and this claim and it is so granted.

### 2. *County Policy Constitutional Claims*

In a suit brought pursuant to § 1983, a municipality may not be held liable under a theory of respondeat superior. *See Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, municipalities are only liable for constitutional deprivations that result from municipal policies or customs that non-policy making municipal employees follow. *See id.* at 690–91, 98 S.Ct. 2018. While the record is clear that the county did not have a formal policy of separating families without probable cause or due process, Plaintiffs can still prevail if they establish that the allegedly unlawful actions were taken pursuant to established custom or that the County's failure to provide adequate training or supervision regarding facilitated communication constituted a municipal policy.

#### a. *Custom*

■ "It is well established that a municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's 'acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'" *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000) (quoting *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Accordingly, even though not formally approved by a municipality, acts performed pursuant to a custom will subject the municipality to liability "on the theory that the relevant practice is so widespread as to have the force of law." *Board of the County Comm'r v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see Jeffes,* 208 F.3d at 61. A municipality may be held liable where the unconstitutional practice in question is "so manifest as to imply the

constructive acquiescence of senior policy-making officials." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992).

In this case, Plaintiffs have not alleged the kind of longstanding practice necessary to create municipality liability based upon custom. Facilitated communication was a relatively new technique at the time Defendants forced Walter to leave the home and took the other actions at issue in the instant suit. Moreover, Plaintiffs have not established that a widespread a practice of reliance on facilitated communication and other evidence existed in the County during the requisite time frame, much less demonstrated that a practice of basing decisions to separate families based solely on unsupported facilitated communication evidence existed.

b. *Failure to train*

■ In order to succeed on a failure to train claim, a plaintiff must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Second Circuit has developed a three part test that is designed to determine the validity of a municipality failure to train claim. *See Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992). Under the *Walker* test, a plaintiff must show that: (1) the policymaker knew "to a moral certainty" that his or her employees will commonly face a particular situation; (2) the situation is frequently mishandled or presents the employee with a difficult choice that may be made easier with training or supervision; and (3) "the wrong choice by the ... employee will frequently cause the

deprivation of a citizen's constitutional rights." *Id.* Recently, a court in this district held:

> [i]n order to show deliberate indifference in claims alleging a failure to train, the plaintiff must demonstrate that either (1) the municipality was put on notice through a series of previous constitutional violations that the need for further training was 'plainly obvious' to the policy makers, or (2) in more limited circumstances, that the municipality had constructive notice of the training deficiency because the constitutional violation which occurred was a 'highly predictable consequence of the failure to [train].' "

*Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (hereinafter *"Zappala II "*) (quoting *Brown,* 520 U.S. at 407–09, 117 S.Ct. 1382).

In *Zappala II,* the court observed that granting the individual defendants qualified immunity "probably preclude[d] municipal liability for a related 'failure to train' claim." *Zappala II,* 980 F.Supp. at 639. The court reasoned that since "the independent actors' conduct was objectively reasonable given the circumstances, it logically follows that the unconstitutional nature of the resulting conduct could not have been 'highly predictable.' " *Id.* Indeed, in that case, the court held that it was not "highly predictable" that the county's failure to train its employees about the unreliability of facilitated communication would result in a constitutional violation. *See id.* The court's basis for this holding rested on the fact that: (1) the plaintiffs had not demonstrated any pre-existing problems with facilitated communication which could have put county officials on notice about its infirmity and (2) "there was no body of general or specialized knowledge among educators or disability specialists that indicated that facilitated

communication was patently unreliable" as of 1992. *Id.*

On the other hand, the Southern District of New York in *Prieto v. County of Orange*, 1997 WL 399662, found the individual defendants' actions objectively reasonable but failed to grant summary judgment on the failure to train claim. *See id.* at *5. *Prieto* is, however, easily distinguishable both *Zappala II* and the case at hand. In *Prieto*, the court specifically noted the competent evidence existed encouraging county employees to use "the difficult and unproven technique of facilitated communication after what a fact-finder could reasonably infer was very minimal training." *Id.* In *Zappala II*, like here, the court could not find any evidence to suggest that the county was affirmatively encouraging the use of facilitated communication evidence. To the contrary, it is apparent in this case that the agency was unfamiliar with the technique and the danger of employing it to confirm or deny allegations of abuse. Because this case cannot be distinguished from *Zappala II*, Plaintiffs' failure to train claim cannot succeed. The Court therefore grants Defendants summary judgment as to Plaintiffs' outstanding municipal claims against the County of Oswego.

### 3. *Claims Against Commissioner Rose*

█ Like the County, Plaintiffs cannot hold defendant Rose, Commissioner of the Oswego County Department of Social Services, liable on a respondeat superior basis. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). In order to establish individual liability under § 1983, Plaintiffs must "demonstrate that the defendant is personally involved in the constitutional violation." *See id.* Personal involvement can be established by showing (1) direct participation, (2) failure to remedy the alleged wrong after learning of it, (3) creation of a policy or custom under which unconstitutional practices occurred, or (4) gross negligence in managing subordinates. *See id.*

In this case, Plaintiffs claim is based upon on defendant Rose's development of an unconstitutional policy or practice. Since the Court has not found any evidence to indicate that such a policy or practice existed, it grants Defendants' summary judgment as it relates to this claim. *See Zappala II*, 980 F.Supp. at 640.

### 4. *State Claims*

Plaintiffs' § 1983 claims are the sole basis for federal jurisdiction over this case. Because all of these claims have been dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3) (district courts may decline supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction").

### 5. *Cross–Claims*

As the Court has dismissed Plaintiffs' case in its entirety, the remaining cross-claims are dismissed as moot.

## III. CONCLUSION

Accordingly, it is hereby

ORDERED that Defendants' motion for summary judgment is GRANTED; and it is further

ORDERED that the remaining cross-claims are hereby DISMISSED; and it is further

ORDERED that Plaintiffs' case is hereby DISMISSED in its entirety; and it is further

ORDERED that the Clerk of the Court serve a copy of this Order on all parties by regular mail

IT IS SO ORDERED.